[L.A. No. 30706. Jan. 5, 1978.]

WILFRED A. MAILAND et al., Plaintiffs,
Cross-defendants and Appellants, v.
ARTHUR JOHN BURCKLE et al., Defendants,
Cross-complainants and Appellants.

**COUNSEL**

Roberts, Carmack, Johnson & Harmer, Roberts, Carmack, Johnson, Poulson & Harmer, H. Hal Visick and John K. Carmack for Plaintiffs, Cross-defendants and Appellants.

Robert D. Hornbaker and Henry T. Heuer for Defendants, Cross-complainants and Appellants.

**OPINION**

**MOSK, J.**—Plaintiffs, Wilfred and Margaret Mailand, as franchisees, entered into an agreement with Arthur and Lois Burckle, Geraldine and Paul Hassan and Green Pastures Dairy (hereinafter defendants) to operate a Palmdale drive-in dairy owned by defendants. Gasoline as well as dairy products were sold on the premises. The agreement required plaintiffs to purchase gasoline from Powerine Oil Company (Powerine), and it provided that defendants could set the price of gasoline sold by plaintiffs, in exchange for a guaranteed profit of 7 percent to plaintiffs on gasoline sales. Defendants collected a rebate from Powerine for each gallon of gasoline Powerine sold to plaintiffs.

After almost two years of operating under the agreement plaintiffs, refusing to allow defendants to set gasoline prices, purchased gasoline from another supplier. They filed an action against defendants and Powerine, alleging that the agreement and the arrangement between defendants and Powerine violated section 16720 of the Business and Professions Code, a provision included in the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.)[1] They sought damages in treble the amount

---

[1] All references in this opinion are to the Business and Professions Code, unless otherwise noted.

Section 16720 provides: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:

"(a) To create or carry out restrictions in trade or commerce.

"(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.

"(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

"(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

"(e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following:

of the rebates Powerine had paid to defendants, and an injunction invalidating the provisions of the agreement giving defendants the power to set the price at which plaintiffs sold gasoline and requiring plaintiffs to purchase gasoline from Powerine. Other violations of law were also alleged.[2]

Defendants cross-complained for declaratory relief, seeking a determination that they had not violated the Cartwright Act, that if such a violation was found the agreement was null and void, and that plaintiffs had breached the agreement.

The trial court found that the agreement and the rebate arrangement between defendants and Powerine did not violate section 16720. As to the cross-complaint, the court found that defendants were not damaged by plaintiffs' conduct. Both plaintiffs and defendants appeal from the ensuing judgment.[3]

The primary issues to be determined are whether the franchise agreement and the rebate arrangement between Powerine and defendants violated section 16720 and, if so, whether defendants may assert the doctrine of *in pari delicto* as a defense to such violations.

### Plaintiffs' Appeal

Defendants operated a dairy and gasoline station in Lancaster, and one in Palmdale, under the name "Green Pastures Drive-In Dairy."

"(1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value.

"(2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure.

"(3) Establish or settle the price of any article, commodity or transportation between them or themselves and· others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity.

"(4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected."

[2] A second cause of action alleged that defendants and Powerine violated sections 17040, 17045, 17048 and 17049, in that they arranged for secret rebates to be paid by Powerine to defendants, and defendants were guilty of locality discrimination. A third cause of action alleged fraudulent conduct on the part of defendants and Powerine.

[3] Powerine settled with plaintiffs for $19,000 before trial, and plaintiffs stipulated that any damage award they receive from defendants would be reduced by that sum. (Code Civ. Proc., § 877.)

Mailand was a deputy sheriff; he contemplated retiring from that position, and was seeking an established business to operate after his retirement. He discussed with defendants on a number of occasions the possibility of leasing the dairy in Palmdale under a franchise arrangement. In these negotiations, Mailand expressed apprehension over the consequences of a gas war, and declined to enter into a franchise agreement unless he was guaranteed a profit on the sale of gasoline. One of the defendants indicated he would be willing to provide such a guarantee on condition that defendants be allowed to set the price of gasoline sold by plaintiffs.

In October 1968, prior to the time the agreement was signed, Powerine agreed, at defendants' request, to charge the Palmdale store for gasoline at a price to be set by defendants and to rebate to defendants the difference between Powerine's normal selling price and the price fixed by defendants. One of the defendants told Mailand that the latter would pay 25.6 or 25.8 cents a gallon for gasoline; he did not state whether this was the wholesale market price. In fact, it was several cents higher than the prevailing market price.

Thereafter, defendants' attorney drafted the franchise agreement, which contained the following provision in paragraph 5(d): "With respect to the gasoline sold through the leased premises . . . [defendants] retain[s] the right to set the gas prices in return for guaranteeing . . . [plaintiffs] a gross margin of seven (7) percent on gasoline sales." The parties interpreted this provision to mean that if plaintiffs' profit on gasoline sales fell below 7 percent, defendants would make up the difference between the profit they realized and 7 percent, and if plaintiffs paid more for gasoline than the price for which they could sell it, defendants would pay them the difference between the price at which they bought and sold, and 7 percent of the sales price. Another provision of the agreement required plaintiffs to purchase gasoline from Powerine, but allowed them to substitute another supplier with the written consent of defendants. Plaintiffs could terminate the agreement on three months' notice.

The agreement was for a period of 10 years, and a lease on the premises was executed for the same term. Plaintiffs paid $10,000 to defendants as an initial franchise fee, and in addition, were obligated to pay 3 percent of gross income as rent and 2 percent of gross sales as royalties, but no less than $1,050 monthly.

After an initial period during which Mailand worked at the Palmdale dairy as an employee, he began operating under the agreement in January 1969. Defendants determined the gasoline prices to be charged by plaintiffs; they set the prices at a rate which was competitive with prices charged by other retailers.

Between May and November 1970, there was a gasoline price war in the Palmdale area, and some of plaintiffs' competitors were forced out of business. During this period, defendants paid plaintiffs over $20,000 in guaranteed profits pursuant to section 5(d) of the agreement. During 1969 and 1970, defendants contacted Powerine from time to time and instructed it to bill plaintiffs three or four cents a gallon over the normal price charged for gasoline, and the sums in excess of the market price were paid by Powerine to defendants. Over a two-year period, these rebates amounted to $61,442.

Plaintiffs became dissatisfied with the price they were required to pay for gasoline and in October 1970 consulted an attorney, who advised them that the arrangement with defendants constituted a violation of the antitrust laws. On November 30, 1970, plaintiffs filed an antitrust action in the federal courts, but it was dismissed on the jurisdictional ground that the gasoline sold by Powerine to plaintiffs did not involve interstate commerce. They then filed the present action. After November 30, 1970, plaintiffs refused to allow defendants to set the selling price of gasoline, and they did not buy gasoline from Powerine. They never requested defendants to allow them to purchase gasoline from another supplier.

The present action was filed against both defendants and Powerine, and alleged violations of section 16720. It was alleged, inter alia, that Powerine and defendants fixed the price at which the former would sell gasoline to plaintiffs without regard to the effect upon free competition, that plaintiffs were prevented from purchasing gasoline from competitors of Powerine, and that the rebate arrangement between Powerine and defendants was not revealed to plaintiffs. The prayer sought as damages treble the amount of $61,442, the sum paid by Powerine to defendants in rebates.[4]

The trial court determined that neither the franchise agreement nor the arrangement between Powerine and defendants violated section 16720. It found as follows: Plaintiffs knew when they signed the

---

[4]Plaintiffs sought the same amount of damages in the second cause of action. The third cause of action, for fraud, added a prayer for punitive damages.

agreement that the phrase "right to set the gas prices" in paragraph 5(d) gave defendants the right to set both the price at which plaintiffs sold gas and the price at which they could purchase it; that they knew they would be required to pay their supplier the market price of the gasoline they purchased plus a markup to establish a fund out of which the guaranteed profit would be paid; and that the supplier.would act as agent to collect the markup and pay it over to defendants.[5] Powerine did not participate in determining the amount of the markup, and acted as defendants' agent in collecting and paying those sums to defendants.

The findings continue: It was reasonable to include a clause in the franchise agreement allowing defendants to set the price at which plaintiffs could sell gasoline because without such reserved power plaintiffs could have caused serious financial detriment to defendants, since they could have lowered the price of gasoline below its cost in order to increase the volume of sales, and collected the maximum guaranteed profit. The provision affording defendants the right to fix the selling price of gasoline was also reasonable because defendants' rents and royalties depended on the gross income and sales, the reputation of the Palmdale dairy depended on the gasoline prices, and plaintiffs had no experience at competitive pricing. Defendants were justified in setting the price at which plaintiffs bought gas from Powerine in order to establish a fund out of which the guaranteed profit would be paid. The requirement that plaintiffs purchase gasoline from Powerine or another supplier approved by defendants was reasonable in order to assure a continuous supply of high quality gasoline to be sold under defendants' trade name.

Plaintiffs were "truly involved in all acts alleged" in the complaint, participated in and received the benefit of those acts, and if any violations of law occurred, they were *in pari delicto* and were barred from recovering.[6] Finally, found the court, plaintiffs failed to mitigate damages because they knew at least as early as July 1969 that defendants were receiving rebates from Powerine but refused either to terminate the

---

[5]These findings are inconsistent with finding 82, in which the court determined that the payment of the markups was not disclosed to plaintiffs until discovery proceedings in this action. This contradiction is irrelevant in the light of the conclusion we shall reach that there was insufficient evidence to support the court's determination that plaintiffs had knowledge before the agreement was signed that they would be charged a markup on the gasoline they purchased from Powerine.

[6]It was found also that plaintiffs were guilty of unclean hands, that they waived their right to recover, and they were estopped from recovering damages because they had "requested, participated in and received the benefit" of the acts alleged in the complaint.

franchise agreement or to agree to a modification under which defendants would have paid Powerine directly for the gasoline and guaranteed plaintiffs a 9 percent "commission" on gross sales of gasoline.[7]

Plaintiffs assert that the provision of the franchise agreement permitting defendants to fix the price at which plaintiffs could sell gasoline, and the arrangement between Powerine and defendants allowing the latter to set the price at which Powerine sold gasoline to plaintiffs constituted price fixing, a violation per se of section 16720. We agree.

We review, initially, several general principles. Certain violations of the antitrust laws are deemed to constitute an illegal restraint of trade as a matter of law. Among these are price fixing. Since the Cartwright Act is patterned after the Sherman Act (15 U.S.C. § 1 et seq.), federal cases interpreting the Sherman Act are applicable in construing our state laws.[8] (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833]; *Oakland-Alameda County Builders' Exchange* v. *F. P. Lathrop Constr. Co.* (1971) 4 Cal.3d 354, 362, fn. 3 [93 Cal.Rptr. 602, 482 P.2d 226].)

In *U.S.* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150, 218, 221 [84 L.Ed. 1129, 1165, 1167, 60 S.Ct. 811], the United States Supreme Court declared, "[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense . . . . Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The [Sherman] Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference."

[7] The trial court similarly found in defendants' favor on both the second and third causes of action.

[8] The Cartwright Act, adopted in 1907, was once referred to as "California's Sleeping Beauty" (Note (1949) 2 Stan.L.Rev. 200). In its first 42 years it produced only 10 reported decisions, 7 by private litigants. It has won more attention in recent years, perhaps because "Californians, like most Americans, believe in a competitive economy." (*Id.* at p. 210.)

Nor is it significant that the prices set pursuant to a price-fixing scheme are reasonable, for the "reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow." (*United States* v. *Trenton Potteries* (1927) 273 U.S. 392, 397 [71 L.Ed. 700, 705, 47 S.Ct. 377, 50 A.L.R. 989].)

■ This court has similarly interpreted the Cartwright Act to prohibit tampering with prices; they must be determined, we have stated, by the "interplay of the economic forces of supply and demand." (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 44 [172 P.2d 867].)

These rules apply whether the price-fixing scheme is horizontal or vertical; that is, whether the price is fixed among competitors (e.g., *United States* v. *Trenton Potteries, supra,* 273 U.S. 392) or businesses at different economic levels (e.g., *Dr. Miles Medical Co.* v. *Park & Sons Co.* (1911) 220 U.S. 373 [55 L.Ed. 502, 31 S.Ct. 376]). Defendants' claim that neither California law nor federal law prohibits price-fixing between noncompetitors is clearly without merit. The federal law in this regard is too well established to require extensive discussion. (See, e.g., *Dr. Miles, Perma Mufflers* v. *Int'l Parts Corp.* (1968) 392 U.S. 134 [20 L.Ed.2d 982, 88 S.Ct. 1981]; *Albrecht* v. *Herald Co.* (1968) 390 U.S. 145 [19 L.Ed.2d 998, 88 S.Ct. 869].)[9] Indeed, at its last term, the Supreme Court reaffirmed this principle. Though reverting to the rule of reason in a case involving vertical geographic restrictions (*Continental T.V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36 [53 L.Ed.2d 568, 97 S.Ct. 2549]) the court pointedly observed that it was concerned there only with nonprice vertical restrictions and that the "*per se* illegality of price restrictions has been established firmly for many years . . . ." (*Id.* at p. 51, fn. 18 [53 L.Ed.2d at p. 581].) As noted above, federal cases interpreting the Sherman Act are applicable in construing the Cartwright Act. Section 16720 refers to a combination of "two or more persons" to fix prices, and its language is not limited to combinations among competitors.

■ It is clear from the literal terms of the franchise agreement that defendants could—and they in fact did—fix the price at which plaintiffs sold gasoline. That this agreement constituted "acts by two or more

[9]*Evans* v. *S. S. Kresge Co.* (3d Cir. 1976) 544 F.2d 1184, relied upon by defendants, states that in order to constitute a per se violation of the Sherman Act, the combination alleged must be between competitors. Nevertheless, it recognizes that vertical restraints imposed by resale price maintenance are presumed to be illegal. (Fn. 26 at p. 1192.)

persons" to fix or establish the price of a commodity within the meaning of section 16720, subdivision (d), also seems clear.[10]

Admittedly, the arrangements between the parties did not amount to the usual vertical arrangement whereby different levels of business entities, completely independent of one another insofar as profits and losses are concerned, agree to maintain a price at which goods will be resold.[11] Here, defendants' right to set the price at which plaintiffs sold gasoline was given in exchange for a guarantee that plaintiffs would realize a 7 percent profit on gasoline sales. This guarantee could have injected some element of risk-sharing into defendants' relations with plaintiffs; it might be theorized that plaintiffs were conducting some type of joint enterprise with defendants for the sale of gasoline and that the prohibition against price-fixing in section 16720 was not intended to apply in such a situation.

However, it is clear that defendants did not assume the risk of losses on gasoline sales to any substantial extent. Their agreement with Powerine for a rebate on each gallon of gasoline purchased by plaintiffs from Powerine was admittedly designed to obtain funds from which the profits guaranteed to plaintiffs would be paid. Thus, defendants attempt to utilize payments to plaintiffs of a guaranteed profit as justification for the right to set the price at which plaintiffs could sell gasoline, while obtaining the money to pay the guaranteed profit from plaintiffs themselves in the form of a markup on the gasoline they purchased from Powerine. This is an ingenious model of economic bootstrapping. Since defendants could set the markup at any amount they deemed advantageous from their own viewpoint, they could always assure that in the long run plaintiffs would pay them in rebates as much or more than defendants were required to pay out as guaranteed profits.[12]

[10]We reject defendants' assertion that there was no "combination" of acts to fix prices because plaintiffs had nothing to say about the prices at the pump. The fact that they agreed to abide by the price set by defendants is sufficient to establish the combination required by section 16720. (*United States* v. *Parke, Davis & Co.* (1960) 362 U.S. 29, 45, fn. 6 [4 L.Ed.2d 505, 515-516, 80 S.Ct. 503].) Moreover, the fact that defendants set the prices at a competitive rate is not a defense because, as pointed out above, the reasonableness of the price established pursuant to an illegal price-fixing scheme does not vitiate its illegality.

[11]Nor was there a horizontal combination since the trial court found, on sufficient evidence, that neither plaintiffs, defendants nor Powerine were in competition with one another.

[12]Defendants could make certain, by their control of the selling and purchase price of gasoline, that they would not be required to pay any sums as guaranteed profits, since they could set those prices at a level to assure that plaintiffs earned a 7 percent profit on

Thus, the provision allowing defendants to set the price at which gasoline was sold at the Palmdale store could not be justified on the basis of the guaranteed profit.

The arrangement between Powerine and defendants also constitutes a violation of section 16720 in that it was a combination to "increase the price of merchandise . . ." in violation of subdivision (b) of section 16720.[13] We are not persuaded by defendants' contention that plaintiffs actually paid Powerine the market price for gasoline and that the additional 3 or 4 cents a gallon added to its cost, which Powerine paid over to defendants, was not part of plaintiffs' purchase price but a markup paid by them in return for the guaranteed profit.

Insofar as plaintiffs were concerned, they were paying the full amount billed by Powerine for gasoline. Powerine billed plaintiffs without indicating that the cost was higher than the wholesale market price of gasoline and that the amount in excess of that price was a markup paid by Powerine to defendants.

Moreover, plaintiffs were unaware prior to signing the franchise agreement that they would be required to pay more than the market price for gasoline. The trial court's contrary findings are not supported by the evidence. As we have seen, the court found that plaintiffs knew when they signed the franchise agreement that the "right to set gas prices" retained by defendants in paragraph 5(d) included the right to set the price at which plaintiffs bought gasoline from Powerine and that they would be required to pay a markup which would be collected by Powerine as agent for defendants. Paragraph 5(d) allows defendants to set the price of gasoline "sold through" the leased premises; it makes no reference to gasoline which plaintiffs purchased for sale.

The only evidence on the subject of plaintiffs' knowledge prior to signing the agreement was testimony that one of the defendants told Mailand that he would pay 25.6 or 25.8 cents a gallon for gasoline, but

---

gasoline sales. Defendants admit as much, for they state that, although they had the power to assure that plaintiffs would earn no more than a gross profit of 7 percent "instead they let [plaintiffs] make an extra 3%."

[13]Once again we note the fact that Powerine did not participate in setting the price at which it sold gasoline to plaintiffs does not establish there was no "combination of . . . acts by two or more persons" to increase the price. Powerine's agreement to follow defendants' directions is sufficient to constitute a violation of this prohibition.

did not state whether this was more or less than the wholesale price. Mailand, who was a deputy sheriff at the time of the conversation and not experienced in the oil business, testified that he did not know the wholesale price. For some months after the agreement was in effect Mailand tried unsuccessfully to discover from Powerine how much it was charging other purchasers for its gasoline. Upon being informed by Powerine of Mailand's inquiries one of the defendants told Mailand to cease annoying Powerine, and that Powerine was not required to tell him the wholesale price.

In these circumstances, we cannot avoid the conclusion that Powerine and defendants entered into an arrangement whereby Powerine would increase the price of gasoline to plaintiffs and would pay the excess over market price to defendants as an undisclosed rebate, a clear violation of subdivision (b) of section 16720.[14]

Under the authorities cited above, the agreement between plaintiffs and defendants and between defendants and Powerine were unlawful per se. It is, therefore, not necessary to inquire whether these arrangements had an actual anticompetitive effect.[15]

■ We come, then, to the trial court's determination that, even if a violation of section 16720 was established, plaintiffs were "truly involved" in the illegal conduct and reaped the benefits thereof, and that they are barred from recovering by the doctrine of *in pari delicto*.

In *Perma Mufflers* v. *Int'l Parts Corp.,* supra, 392 U.S. 134, Justice Black discussed the application of the *in pari delicto* doctrine in the

[14]*Seligson* v. *Plum Tree, Inc.* (E.D.Pa. 1973) 361 F.Supp. 748, relied upon by defendants, is distinguishable. There, a franchisor purchased goods at a discount from suppliers and sold them at a markup to its franchisees. The court found that there was no violation of the Sherman Act because the franchisor acted merely as the wholesaler and took a wholesaler's markup on the goods sold to the franchisee. Defendants claim that if they had purchased gasoline from Powerine and resold it to plaintiffs, the situation would be identical to *Seligson,* and the only difference between that case and the arrangement here is that Powerine did the bookkeeping for defendants. However, in *Seligson* there was no agreement between the franchiser and the supplier as to what price should be charged the franchisee. Here there was such an agreement, and it was secret. Nor was there in *Seligson* a provision allowing the franchisor the right to set the price at which the franchisee sold the goods to be purchased from the franchisor.

[15]Thus, the fact that defendants set the price at which plaintiffs sold gasoline at approximately the level of plaintiffs' competitors is not important. Under the franchise agreement, they had absolute power to fix the price, and they could, if they wished, have pegged it higher or lower than market price.

context of antitrust violations. There, Midas, Inc., a wholly owned subsidiary of a manufacturer of automobile mufflers, entered into a sales agreement with a chain of dealers obligating the dealers to purchase all their mufflers from the subsidiary, to sell the mufflers at a fixed price, and to refrain from dealing with Midas' competitors. The agreement was cancelable by either party on 30 days' notice. It was held that the dealers were not barred from challenging various provisions of the sales agreement as illegal restraints of trade on the ground that they were *in pari delicto* with Midas.

The court reasoned that whether or not "truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of *in pari delicto,* for barring a plaintiff's cause of action," such involvement was not shown. Although the dealers had made large profits, had eagerly sought to acquire additional franchises, and were fully aware of the restrictions they challenged, it was held nevertheless that the illegal scheme was thrust upon them by Midas. The court pointed out that the dealers did not actively seek each clause of the agreement, many provisions were detrimental to their interests, and they accepted the restraints only because their acquiescence was necessary to obtain an otherwise attractive business opportunity.[16]

Cases subsequent to *Perma* have declared that if a plaintiff does not bear equal responsibility for establishing the illegal scheme, or if he is compelled by economic pressures to accept such an agreement, he cannot be barred from recovering because he participated therein. (See *Columbia Nitrogen Corporation* v. *Royster Company* (4th Cir. 1971) 451 F.2d 3, 15-16; *Premier Electrical Construction Co.* v. *Miller-Davis Co.* (7th Cir. 1970) 422 F.2d 1132, 1138.)

We hold that under these principles plaintiffs are not barred from recovering. Although they sought a guaranteed profit on gasoline sales, the device of achieving this goal by the illegal means of allowing defendants to set the sale price of gasoline was defendants' invention. Moreover, plaintiffs neither participated in nor had any knowledge of

---

[16]Justice Black, writing for the court, states that "the doctrine of *in pari delicto* . . . is not to be recognized as a defense to an antitrust action." (392 U.S. at p. 140 [20 L.Ed.2d at p. 991].) However, a majority of the justices did not join in this sweeping proposition. Justices White, Fortas and Marshall, in concurring opinions, and Justices Harlan and Stewart, in a concurring and dissenting opinion, all appeared to agree that the defense of *in pari delicto* is appropriate in an antitrust action if the parties are in equal fault with one another.

the secret rebate arrangement between Powerine and defendants before they entered into the agreement.[17]

■ Plaintiffs also assert that the provision of the franchise agreement requiring them to purchase gasoline from Powerine is unlawful per se as an illegal tie-in contract. ■ As described in *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 856-857 [94 Cal.Rptr. 785, 484 P.2d 953], the definition and effect of such a contract is " 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier . . . .' Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." . . . They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power of leverage in another market. At the same time buyers are forced to forego their free choice between competing products.' . . . Tying arrangements are illegal per se 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . .' "

Tie-in agreements which "substantially lessen competition or tend to create a monopoly" are illegal under section 16727.[18]

■ Plaintiffs claim that they purchased from defendants the lease, the right to use defendants' business system, and the trade name "Green Pastures Dairy," and that the franchise agreement illegally ties these purchases to the requirement that plaintiffs purchase gasoline from Powerine. The trial court found that this requirement was not tied to the

---

[17]For the reasons set forth above, the trial court's findings that plaintiffs are barred from recovery under the doctrines of unclean hands, waiver and estoppel may not be upheld. These conclusions were based upon plaintiffs' asserted participation in the price-fixing scheme.

[18]Section 16727 provides: "It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

lease, the right to use the Green Pastures trade name or defendants' business system, that defendants did not have sufficient economic power with respect to these matters to appreciably restrain competition in the market for gasoline or any other product, and that the requirement imposed upon plaintiffs was reasonable to assure a continuous supply of high-grade gasoline.

Whether or not the provision requiring plaintiffs to purchase from Powerine meets all the requirements for a tie-in arrangement, it is an indispensable part of the illegal price-fixing scheme devised by defendants. Their testimony leaves no doubt that they viewed it as essential in order to provide rebates for the payment of the guaranteed profits. In these circumstances, the restriction falls with the price-fixing scheme and must be held invalid.[19]

Thus, the trial court's judgment must be reversed.[20] In view of our conclusion that plaintiffs must prevail in their first cause of action, it is not necessary to decide whether defendants also violated other provisions of law, as alleged in the second cause of action. Plaintiffs sought exemplary damages for fraud in their third cause of action, alleging that defendants "expressly stated, and by their actions implied" that plaintiffs were purchasing gasoline from Powerine at market price. The trial court found that these allegations were not supported by the evidence. Plaintiffs assert that this finding was incorrect because the provisions of the franchise agreement setting royalties at 5 percent implied that this was the total amount of royalties received from plaintiffs, whereas in fact defendants were receiving additional royalties in the form of secret rebates. While the trial court might have found such an implication from the franchise agreement, it did not do so factually and we cannot hold that such a finding was compelled as a matter of law.

[19]Plaintiffs did not seek to substitute another supplier for Powerine, as they were entitled to do under the agreement provided that defendants gave permission. However, it is clear that defendants viewed the rebate arrangement as an indispensable part of the agreement, and that permission to substitute a supplier who refused to accede to a rebate would have been refused.

[20]Since the trial court found for defendants, it did not make any findings on the issue of damages. It did find that plaintiffs failed to mitigate damages because they did not terminate the agreement in July 1969, after they discovered that Powerine was paying rebates to defendants on gasoline sales, and because they failed to accept a modification agreement offered by defendants in early 1970. Whether these findings would support the conclusion that plaintiffs failed to mitigate damages we need not decide. Even if such a conclusion were justified, only a partial reduction in the damages would result, since the findings relate to only a portion of the period during which the invalid provisions of the franchise agreement were in effect.

*Defendants' Appeal*

Defendants appeal from the trial court's determination that, while plaintiffs violated the franchise agreement in that they refused to allow defendants to set the gas prices after November 30, 1970, and did not purchase gas from Powerine subsequent to that date, defendants were not damaged by such conduct.

In view of our determination that paragraph 5(d) of the franchise agreement is invalid, the conclusion follows that plaintiffs did not breach the agreement by refusing to allow defendants to set the selling price of gasoline after November 30, 1970. The same reasoning applies to plaintiffs' failure to comply with the requirement that they purchase gasoline from Powerine.

■ We consider defendants' assertion that the entire franchise agreement must be declared void because paragraph 5(d) is invalid. Section 16722 provides that agreements in violation of the Cartwright Act are void. The rule is settled that partially illegal contracts may be upheld if the illegal portion is severable from the part which is legal. (*Keene* v. *Harling* (1964) 61 Cal.2d 318, 320-321 [38 Cal.Rptr. 513, 392 P.2d 273].) Here, paragraph 5(d) expressly provides that the right of defendants to set the price of gasoline sold by plaintiffs is given in exchange for the guaranteed profit of 7 percent on gasoline sales. Since these promises are specifically given in exchange for one another, the entire provision may be excised from the franchise agreement without doing violence to its essential objects. The same result obtains with respect to the provision requiring plaintiffs to purchase gasoline from Powerine. The only damages asserted by defendants as a result of plaintiffs' alleged breach of this provision is that defendants did not receive the rebates which we have held to be illegal. In our view, this provision may also be deleted without undermining the essential objects of the agreement.

The judgment is reversed. Plaintiffs are to recover costs on appeal.

Bird, C. J., Tobriner, J., and Manuel, J., concurred.

**CLARK, J.,** Dissenting.—Anomalously, the majority use the anti-price-fixing provisions of the Cartwright Act—designed to reduce prices and to eliminate restraint of trade—to invalidate contractual provisions designed to reduce prices and to foster competition with other retailers.

The undisputed evidence establishes the enterprise would sell gasoline at prices at or below its competitors; that when plaintiffs took over the enterprise, contract provisions were adopted to assure its prices would be maintained at or below the price of any competitor even during price wars; that defendants in fact set the retail price 1 cent below the lowest price charged by any competitor; and that after plaintiffs breached the agreement, they raised the prices above those of some competitors.

The trial court properly concluded defendants have not violated the Cartwright Act. Where, as here, both the right to profit and the risk of loss from retail sales are shared by noncompeting parties, an agreement between them regarding price to be charged does not constitute a per se violation of antitrust regulations. Rather, the rule of reason is applicable. Because the challenged business relation was intended to promote competition and neither stifled competition in fact, nor had any tendency to do so, the price agreement did not violate the act. While defendants' secret commission may have constituted a breach of contract or a tort, it did not stifle competition within the meaning of the act. Viewed alone or in conjunction with the price agreement, the commission does not warrant an award of treble damage.

### JOINT ENTERPRISE

Although price fixing by two business entities has been held a per se violation of antitrust regulations, there are exceptions. (*Battle* v. *Liberty National Life Insurance Company* (5th Cir. 1974) 493 F.2d 39; *Congoleum Industries, Inc.* v. *Armstrong Cork Company* (E.D.Pa. 1973) 366 F.Supp. 220, affd. 510 F.2d 334.) One such exception exists when the entities are not truly independent but act as a joint enterprise in the sale of a product.

Such a situation was presented in *Evans* v. *S. S. Kresge Co.* (3d Cir. 1976) 544 F.2d 1184, 1186-1187, cert. den., 433 U.S. 908 [53 L.Ed.2d 1092, 97 S.Ct. 2903], where two independent business entities used the same name under the same roof. A small percentage of the products sold by each was also sold by the other, each agreeing to charge the same prices

for the items carried by both. The court concluded establishing prices did not violate federal antitrust laws.[1]

The court in *Kresge* reasoned that the two entities, independent for most purposes, may be viewed as partners for the purpose of antitrust analysis. "In addition, to the extent that Kresge and Hempfield offered like products for sale and competed 'as one' with other establishments, the two acted as 'partners' in establishing and operating under joint merchandising and pricing policies." (*Evans* v. *S. S. Kresge, supra*, 544 F.2d 1184, 1191-1192.) The court stated that a means for determining the price to be charged which is ". . . designed only for the operation of a more efficient unified competitive entity vis-a-vis others—cannot be said to either 'suppress' or 'destroy' competition." (*Evans* v. *S. S. Kresge, supra*, 544 F.2d 1184, 1196.)

In the instant case, plaintiffs and defendants were in effect engaged in a joint enterprise. Both relied upon retail sale of gasoline for a return on their investment, and both shared the risk of loss. Owning real and personal property and goodwill, defendants were to be compensated through rental and royalty of 5 percent of gross retail sales, with a guaranteed minimum. Defendants' commissions from Powerine were also dependent upon the volume of plaintiffs' sales. Defendants' rental from their real and personal property and royalty for the franchise were directly related to the retail sales by plaintiffs. If prices were established so high that plaintiffs could not compete with other retailers, defendants obviously would suffer along with plaintiffs. Remember, plaintiffs' complaint was that prices were *too low*.

Further, defendants not only shared in plaintiffs' potential losses but also increased their own risk of loss by guaranteeing plaintiffs a 7 percent gross profit on gasoline sales. If the retail gasoline price was fixed very low so as to increase volume, thus increasing rental, defendants would suffer large losses on their guarantee.

It is unrealistic to conclude, as the majority do, that defendants did not assume "the risk of losses on gasoline sales to any substantial extent." (*Ante*, p. 378.) Defendants not only took the risk of the guaranteed profit but also the risk that their substantial property and royalty interests would realize little or no return. The complex method of sharing the profits and losses of the business establishes that defendants were directly

---

[1]The majority recognize that federal precedents are applicable in construing the act. (*Ante*, p. 376.)

involved in the venture's success and that they were engaged with plaintiffs in a joint enterprise competing with other retailers.

The majority tell us that in the "long run" the rebates would pay defendants as much or more than they were required to pay out as guaranteed profits. (*Ante,* p. 378.) However, bankruptcy courts are filled with debtors whose businesses might have become profitable in the "long run," but somehow become insolvent in the shorter run. Both sides in the instant case presented evidence that competitors were driven out of business by the price wars—businesses which, had they survived the wars, might have succeeded in the "long run." We do not know whether plaintiffs would have survived absent the $20,000 received under the guarantee, nor do we know when defendants would have become insolvent had the price war continued.

The provisions establishing prices and guaranteeing profits viewed either alone or with the rental provision, caused defendants to assume much of the profit and loss risk of the joint enterprise. The price provision was designed to, and had the effect of, creating a joint enterprise permitting competition with others during price wars. Like the *Evans* association, the arrangement "cannot be said to either 'suppress' or 'destroy' competition."

The majority concede that no horizontal combination restricting competition existed. (*Ante,* p. 378, fn. 11.) They also recognize that the relationship between the parties did not constitute the type of vertical arrangement which has been found illegal per se by the courts in the past. (*Ante,* p. 378.) The record clearly reveals the joint enterprise was designed to compete successfully with other retailers and was not an attempt to restrict or restrain the market place.

### COMMISSION

The commissions paid by Powerine to defendants do not violate the Cartwright Act. Again, defendants were not in competition with plaintiffs. Those commissions were no more in restraint of trade than any commission paid by a manufacturer or wholesaler to its salesman. Indeed, the majority's commission discussion casts doubt on the validity of the millions of salesman commission contracts in this state.

While the commission agreement with Powerine may have been "secret," secrecy can hardly be said to restrain trade in the market place.

Secrecy may facilitate the efficacy of an agreement or practice restraining trade, but it is the practice—not its covert nature—which determines whether restraint exists. While secret commissions in the instant case may give rise to an action for breach of contract or for tort, they do not constitute a restraint of trade violative of the Cartwright Act, warranting treble damages.[2]

## CONCLUSION

The anti-price-fixing provisions of the Cartwright Act are intended to prevent restraints on trade hindering competition. It is obvious neither plaintiffs nor defendants intended to restrain trade, to impair competition or to alter existing market conditions. Rather, the clear purpose of the price provisions was to establish a means of payment for the leased premises, the franchise, and the guaranteed profit. These provisions not only allowed but required plaintiffs to compete with other retailers at all times, including price wars. Plaintiffs, perhaps suffering buyer's remorse, should not now be permitted to avoid their obligations on the basis of a public policy which was furthered—not violated—by the agreement. Much less should plaintiffs be allowed a triple reward.

Richardson, J., concurred.

The petition of the cross-defendants and appellants for a rehearing was denied March 9, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

---

[2]The majority do not discuss potential recovery for breach of contract or fraud. Plaintiffs have already recovered $19,000 from Powerine by settlement and over $20,000 in guaranteed profits. In addition, the trial court found that after plaintiffs discovered the rebates in July 1969 they failed to mitigate damages. It is by no means clear that they could recover more than already recovered absent an award of treble damages.