Opinion
 

 KAUS, P. J.
 

 R. E. Spriggs Company, Inc., appeals from a judgment on its cross-complaint in favor of cross-defendant Adolph Coors Company.
 

 Adolph Coors Company (Coors) is a Colorado corporation. It manufactures, brews, and bottles beer .only in Golden, Colorado, and sells it, f.o.b. Golden, to wholesale distributors in 11 western states, including California.
 

 Appellant R. E. Spriggs Company, Inc. (Spriggs) owned and operated a wholesale distributorship in Los Angeles, California. Spriggs distributed Coors’ products from 1937 until its termination in 1964. The written distribution agreements between Coors and its distributors, including Spriggs, designated the territory within which each could distribute Coors beer.
 

 On Spriggs’ termination, Coors sought injunctive relief against Spriggs’ continued sales. Spriggs cross-complained in October 1965, alleging a combination in restraint of trade, and seeking damages under the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.) In the parties’ joint pretrial statement—the controlling document before the court—Spriggs contended that during the relevant years preceding October 1965 the Coors-Spriggs written agreements violated the act “by reason of the territorial limitations therein,
 
 and because the control afforded to Coors by such agreements in combination with other agreements between Coors and Spriggs resulted in illegal price fixing,”
 
 and, further, that such agreements “resulted in territorial limitations,
 
 price fixing
 
 and conspiracy to exclude Spriggs from selling beer in Los Angeles County, all in violation of the Cartwright Act.” (Our italics.)
 

 Initially, the trial court dismissed for lack of jurisdiction, reasoning that since all relevant activities involved interstate commerce the supremacy clause of the United States Constitution and the Sherman Antitrust Act precluded application of the Cartwright Act to the factual situation. This
 
 *423
 
 court reversed and remanded, finding no preemption.
 
 (R. E. Spriggs Co.
 
 v.
 
 Adolph Coors Co.
 
 (1974) 37 Cal.App.3d 653 [112 Cal.Rptr. 585].)
 

 Later, the trial court, pursuant to stipulation by the parties, ordered the cause bifurcated and proceeded initially only on the question whether Coors had violated the act.
 

 Facts
 

 During the trial Spriggs established the economic dominance of Coors in its relationship with its distributors. A Coors’ distributorship was a valuable, but fragile asset, terminable without cause on 30 days’ notice. Coors had a waiting list of about 7,000 applicants for a total of 167 distributorships. Clearly the situation was tailored for Coors’ wishes to become the distributors’ commands.
 

 As noted, each distributorship contract contained strict territorial restrictions which Coors defended in the name of efficiency in distribution, quality control and so forth. Admittedly, however, the territorial restrictions totally eliminated intrabrand competition at the wholesale level. Further, it is quite clear from the record that they made it easier for Coors to monitor both wholesale and retail prices. Coors maintained a staff of field representatives whose business it was to keep check on the distributors: one of their specific duties was to report distributors’ price changes—up or down—to Coors.
 

 The matter of prices charged at the wholesale and retail levels was admittedly vital to Coors. A policy memorandum distributed after the period in question, but admitted to be relevant at all times, contained the following instructions to its distributors: “In order to maintain a successful wholesale or retail business, pricing integrity is essential. Pricing integrity will result in adequate and equitable profit to both Distributor and retailer and is fair to the ultimate consumer.
 

 “It is the policy of the Adolph Coors Company to suggest, if it so chooses, to either the wholesaler or retailer level, suggested minimum pricing. We reserve the right to further that policy by simply refusing to deal with anyone who doesn’t adhere to said policy.
 

 “The Adolph Coors Company and its agents must only state the policy. They cannot make agreements, threaten, coerce or intimidate wholesalers or retailers in any manner. They can enforce the policy only by reserving
 
 *424
 
 the right to refuse to deal with those who don’t adhere to the suggested prices.”
 
 [1]
 

 While this pricing policy memorandum speaks only of minimum pricing, the record indicates that Coors was not just interested in minimum pricing, but in price fixing, period. Thus, its president and chairman of the board testified that if wholesale prices could not be kept down, the company would not survive. Both wholesale and retail profit margins were “suggested” at such levels that both the distributor and the retailer got a “fair return” if they ran a “tight ship.” Coors’ philosophy was that it was in partnership with the distributors and retailers and if any one of the three partners got out of step “the castle [would] come tumbling down.” According to this witness Coors’ pricing policy was enforced by its representatives who went around to the distributors to discuss wholesale prices with them. They made suggestions as to such prices and attempted to persuade the distributors to follow them. When a distributor had too high a markup Coors “strongly” suggested that he do something about it. Low markups were, however, equally frowned on. According to one Bamhardt, Coors’ vice president of sales, Coors did not permit any rebates or discounts. “Everything is on a one-price basis. We do not appreciate our distributors rebating or discounting in any fashion. We think that that is an undesirable part of marketing.”
 

 Earnhardt left little doubt that Coors’ efforts at persuasion were successful, at least with those distributors who wanted to stay in the “partnership.” Asked whether it was his experience that the distributors normally complied with Coors’ policies, he replied:
 
 “It is our experience that all of those that are still representing us do comply with our policies. We feel that way or they wouldn’t be representing us. ”
 
 (Italics added.)
 

 Earnhardt also testified that Coors’ California distributors complied with the beer price posting provisions of section 25000 of the Business and Professions Code by having Coors post the prices at which distributors would sell.
 
 [2]
 

 
 *425
 
 Eventually the trial court signed findings and conclusions. We summarize the highlights: 1. Compliance with various state laws could “be accomplished in an effective way only by absolute designation of responsibility under territorial guidelines.” 2. Territorial limitations on distributorships were the only practicable way for insuring quality control. 3. Further, such territorial limitations and certain regulations which Coors enforced prevented distributors from servicing only the large, profitable accounts. Thus the system vindicated the public’s “right to the widest availability of Coors beer.” 4. The territorial limitations had no restraining effect on interbrand competition. 5. There was no evidence that the people of Los Angeles would have benefited from intrabrand competition and there was evidence to the contrary. 6. There was no collusion among Coors’ distributors. 7. The territorial limitations were a vertical restraint but did not, per se, violate the Cartwright Act. 8. The territorial limitations were reasonable under the Cartwright Act in the light of Coors’ legitimate need to insure quality control and compliance with all applicable state laws and regulations.
 

 Discussion
 

 The most obviously meritorious contention of Spriggs’ is that the trial court failed to make any finding “on the issue of price maintenance as a part of the territorial restraint.” Although Spriggs submitted about four pages of proposed finding on that issue,
 
 [3]
 
 the court’s findings simply ignore it. Coors does not deny this, but insists that for two different reasons it does not really matter.
 

 First—though second in sequence of argument—Coors claims that no finding on the issue was necessary because “Spriggs produced no evidence at the trial of such price fixing. . . .” We think that we have shown that this is simply not so. Under the total circumstances of this case Coors simply cannot find refuge in the
 
 Colgate
 
 doctrine (see fn. 1,
 
 ante).
 
 Coors’ ideas about proper prices at the wholesale and retail level may only have been couched in terms of suggestions, but having in mind Coors’ relative economic clout, particularly its power to cancel valuable distributor franchises almost at will, it seems clear that there is evidence that Coors engaged in price maintenance through suggestions which the distributors could not refuse. (Cf.,
 
 United States
 
 v.
 
 Parke, Davis & Co.
 
 (1960) 362 U.S. 29, 44 [4 L.Ed.2d 505, 515, 80 S.Ct. 503]: “When the manufacturer’s actions, as here, go beyond mere announcement of his
 
 *426
 
 policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices ... he has put together a combination in violation of the Sherman Act.”)
 
 [4]
 

 Coors’ second justification for the trial court’s failure to make a finding on price maintenance is couched in terms of impossibility: “The trial court could not have made a finding that there were illegal price controls in view of the ABC law which expressly permitted such controls.”
 

 There are several reasons why the point is specious. Coors refers, of course, to what is now subdivision (i) of section 24755 of the Business and Professions Code.
 
 [5]
 
 That subdivision in effect provides for optional maintenance of minimum retail prices of beer. It does not apply here first, because Coors has never sought to comply with the provisions of section 24755 e.g., the filing of price schedules;
 
 [6]
 
 second, because the statute only applies to retail prices; and third, because the statute only permits the fixing of minimum prices. As our recital of facts has demonstrated, there was evidence that Coors was not just interested in minimum prices—no discounts or rebates—but rather in prices as such, fixed by it and determined by its view of an appropriate profit margin if a distributor ran a “tight ship.” This type of price control goes far beyond anything which section 24755 permits.
 
 [7]
 

 
 *427
 
 Coors also points to a 1972 statute—passed seven years after the relevant period—section 25000.5 of the Business and Professions Code, which compels beer manufacturers to designate territorial limits of wholesalers and prohibits a wholesaler from filing price schedules under Business and Professions Code section 25000 (see fn. 2, ante) unless he has entered into and filed a written agreement outlining his territory.
 

 Frankly we have no information as to just what considerations triggered this statute. Presumably, however, it was intended to change the law
 
 (Union League Club
 
 v.
 
 Johnson
 
 (1941) 18 Cal.2d 275, 278-279 [115 P.2d 425]) and not to ratify Coors’ practice. In any event, the statute does not permit the assigning of territories as a means of price fixing.
 

 Spriggs’ second point relates to its claim that Coors is collaterally estopped by the findings in
 
 Copper Liquor Inc.
 
 v.
 
 Adolph Coors Co.
 
 (5th Cir. 1975) 506 F.2d 934 and
 
 Adolph Coors Company,
 
 v.
 
 F. T. C.
 
 (10th Cir. 1974) 497 F.2d 1178 [30 A.L.R.Fed. 1] (cert. den. 419 U.S. 1105 [42 L.Ed.2d 801, 95 S.Ct. 775]). If Spriggs is correct, the trial court’s findings will need drastic revision.
 

 At trial, Spriggs introduced evidence that the distributorship contracts involved in
 
 F. T. C.
 
 and
 
 Copper Liquor
 
 were identical in substance to the Spriggs/Coors agreements and that Coors’ manner of enforcement thereof—including its attempts at persuading distributors to adhere to its pricing policies—was consistent throughout the relevant period.
 

 Copper Liquor
 
 involved a retail liquor store owner who brought an action under section 1 of the Sherman Act (15 U.S.C. § 1), alleging that Coors conspired or combined with its distributors to fix the retail price of its beer and to create and enforce exclusive territories. A verdict for plaintiff was sustained by the Court of Appeal which found that “[t]he restrictions Coors imposed [upon its distributors] necessarily facilitated price fixing,” that “[a] jury could reasonably conclude . . . that the territorial restrictions have as much to do with Coors’s [sic] attempts to maintain wholesale and retail price levels as with its concern with
 
 *428
 
 maintaining the quality of its beer” and that the territorial restrictions “were ancillary to an illegal price fixing scheme.” (506 F.2d at pp. 946, 947, 948.)
 

 In
 
 F. T. C.
 
 the commission had found massive evidence of price fixing in findings quoted below
 
 [8]
 
 and upheld by the Court of Appeals. It then found that Coors vigorously enforced its territorial restrictions and that, in view of the unlawful price fixing, there were “[sjtrong grounds for presuming that the most injurious effects of vertical territorial divisions may be operative, and, therefore, for holding the entire arrangement of territories with price fixing illegal per se.”
 
 {Id.,
 
 at p. 1186.)
 

 Unquestionably,
 
 Copper Liquor
 
 and
 
 F. T. C.
 
 decided,
 
 as factual matters,
 
 that Coors’ territorial restraints were ancillary to a price fixing scheme. This makes irrelevant Coors’ principal point that both
 
 F. T. C.
 
 and
 
 Copper Liquor
 
 were based upon the now defunct doctrine of
 
 United States
 
 v.
 
 Arnold, Schwinn & Co.
 
 (1967) 388 U.S. 365, 379 [18 L.Ed.2d 1249, 1260, 87 S.Ct. 1856], that under certain circumstances territorial restrictions alone were illegal per se.
 
 Schwinn
 
 was, of course, overruled in
 
 Continental T. V, Inc.
 
 v.
 
 GTE Sylvania, Inc.
 
 (1977) 433 U.S. 36, 57-58 [53 L.Ed.2d 568, 584-585, 97 S.Ct. 2549], but the legal demise of the
 
 Schwinn
 
 rule is beside the point. What we are interested in—and what the trial court should have been interested in—are the factual findings of
 
 F. T. C.
 
 and
 
 Copper Liquor
 
 that the territorial restrictions were ancillary to an illegal price fixing scheme. Price fixing, of course, has been illegal per se for decades and still is. (See e.g.,
 
 Goldfarb
 
 v.
 
 Virginia State Bar
 
 (1975) 421 U.S. 773 [44 L.Ed.2d 572, 95 S.Ct. 2004];
 
 United States
 
 v.
 
 General Motors Corp.
 
 (1966) 384 U.S. 127, 147 [16 L.Ed.2d 415, 427, 86 S.Ct. 1321] and cases cited therein.)
 

 
 *429
 
 The cases cited by Coors
 
 (Chern
 
 v.
 
 Bank of America
 
 (1976) 15 Cal.3d 866 [127 Cal.Rptr. 110, 544 P.2d 1310],
 
 Louis Stores, Inc.
 
 v.
 
 Dept, of Alcoholic Beverage Control
 
 (1962) 57 Cal.2d 749 [22 Cal.Rptr. 14, 371 P.2d 758],
 
 Cochran
 
 v.
 
 Union Lumber Company
 
 (1972) 26 Cal.App.3d 423 [102 Cal.Rptr. 632] and
 
 Eichler Homes, Inc.
 
 v.
 
 Anderson
 
 (1970) 9 Cal.App.3d 224 [87 Cal.Rptr. 893]) really support Spriggs.
 
 Chern, Cochran
 
 and
 
 Louis Stores
 
 all concerned the issue of whether a question of law actually litigated and determined by a final and valid judgment may be asserted under the doctrine of collateral estoppel. In
 
 Chern,
 
 for instance, although the court rejected the claim, it noted, “a principal issue in the instant case is essentially a legal one. . . . No material dispute exists concerning the relevant facts in the present case. In contrast, the estoppel cases relied on by defendant, including
 
 Bernhard
 
 [v.
 
 Bank of America
 
 (1942) 19 Cal.2d 807, 813 (122 P.2d 892)], involved attempts to relitigate
 
 factual
 
 issues arising out of the same subject matter or transaction as the prior suit. The difference is significant.” (Italics in original;
 
 id.,
 
 p. 872.) This was but an echo of
 
 City of Los Angeles
 
 v.
 
 City of San Fernando
 
 (1975) 14 Cal.3d 199 [123 Cal.Rptr. 1, 537 P.2d 1250]; “The res judicata effect of the prior determination between the parties of a question of
 
 law
 
 may differ from the effect of such prior determination of a question of
 
 fact.”
 
 (Italics in original;
 
 id.,
 
 at p. 230.) Similarly, in
 
 Cochran,
 
 appellant’s claim was denied because injustice would result if patently erroneous conclusions of law were given estoppel effect. And in
 
 Eichler
 
 the court refused to apply the doctrine only because “the issue of the case before us cannot reasonably be said to be identical to that which was litigated and determined [in the prior action].” (9 Cal.App.3d at p. 234.) As noted above, the issues involved in this case are precisely those litigated and decided in
 
 FTC
 
 and
 
 Copper.
 

 Coors concedes, as it must, that
 
 Bernhard
 
 permits a stranger to assert the doctrine defensively, as a shield. It argues, however, that we should not extend the doctrine to encompass offensive use as well. Under the circumstances, we disagree.
 

 Use of collateral estoppel as a sword is not novel. (See
 
 Vanguard Recording Society
 
 v.
 
 Fantasy Records Inc.,
 
 (1972) 24 Cal.App.3d 410 [100 Cal.Rptr. 826]; 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 243.) Moreover, as aptly pointed out by Spriggs’ counsel, the offensive—defensive distinction is an anachronism no longer deserving of judicial recognition. This point is succinctly made in
 
 O’Connor
 
 v.
 
 O’Leary
 
 (1967) 247 Cal.App.2d 646, at pages 649-650 [56 Cal.Rptr. 1]; “We are of the opinion that application of the doctrine of collateral estoppel, absent
 
 *430
 
 the element of mutuality, is not dependent upon whether it is asserted offensively or defensively, but upon whether, under the particular circumstances at hand, policy considerations restrict its use. Generally, the objective of res judicata and its affiliate collateral estoppel, is to prevent ‘vexatious litigation with its attendant expense both to the parties and the public.’ [Citation.] Where this objective will not be aided by application of these doctrines, and assertion thereof would ‘defeat the ends of justice or important considerations of policy,’ they may not be invoked. [Citations.]”
 

 We perceive none of the pernicious policy objections enumerated in
 
 O’Conner
 
 to beset our application of the doctrine in the case before us. This is not one of a set of cases maintained by different persons in separate negligence actions for personal injuries against a single defendant, the most common area in which assertion of the doctrine has been denied. (See
 
 Nevarov
 
 v.
 
 Caldwell
 
 (1958) 161 Cal.App.2d 762 [327 P.2d 111].) Nor is it a case where application of the doctrine will work an obvious injustice upon Coors’ interests.
 
 [9]
 
 To be sure, application of the doctrine effectively bars Coors’ chances of obtaining a more favorable determination of the factual circumstances surrounding its distribution scheme than it did in
 
 F. T. C.
 
 and
 
 Copper Liquor.
 
 However, in litigating those cases Coors had two full opportunities to present its case, and inasmuch as it does not argue that it had insufficient reason to fully defend in either action we see no independent basis for a third try.
 
 [10]
 
 On
 
 *431
 
 the other hand, proper application of the doctrine furthers judicial economy in an overly litigious society, insures against the possibility of inconsistent results, and comports with our notions of fair play and substantial justice.
 

 The most recent case on the issue decided by the United States Supreme Court is
 
 Parklane Hosiery Co.
 
 v.
 
 Shore
 
 (1979) 439 U.S. 322 [58 L.Ed.2d 552, 99 S.Ct. 645], where the court discusses at great length the difference between collateral estoppel as a sword and as a shield and finally decides on the approach of the Restatement Second of Judgments (Tent. Draft No. 2, 1975) section 88, which allows for broad discretion in the application of collateral estoppel as an offensive weapon.
 
 (Id.,
 
 pp. 326-333 [58 L.Ed.2d at pp. 559-563].) The criteria under which such determinations are to be made are fully set forth in the tentative draft referred to and to repeat them here would be an exercise in redundancy.
 
 [11]
 
 Suffice it to say that for the reasons stated we see no unfairness in denying Coors’ a third opportunity to litigate the legality of territorial restrictions designed as part of a price fixing scheme.
 

 In sum, we hold that the trial court erred in failing to find as a matter of law that the factual circumstances surrounding Coors’ imposition of territorial restraints upon Spriggs were determined in
 
 F. T. C.
 
 and
 
 Copper Liquor,
 
 and that Coors’ was barred from relitigating in this case the question whether it imposed territorial restraints upon Spriggs in order to facilitate a price fixing scheme.
 
 [12]
 

 
 *432
 
 The judgment must therefore be reversed. While the first error discussed—failure to find on the issue of price fixing—would, at most, call for a retrial on the issue of liability, the preclusive effect of
 
 F. T. C.
 
 and
 
 Copper Liquor
 
 leaves only the question of damages to be resolved.
 

 The judgment is reversed with directions to make findings on the issue of liability consistent with this opinion and to try the issue of damages.
 

 Stephens, J., and Hastings, J., concurred.
 

 A petition for a rehearing was denied July 23, 1979, and the opinion was modified to read as printed above. Respondent’s petition for a hearing by the Supreme Court was denied September 6, 1979.
 

 [1]
 

 This last paragraph was obviously a self-serving statement that Coors would not stray beyond the rule of
 
 United States
 
 v.
 
 Colgate & Co.
 
 (1919) 250 U.S. 300, 307 [63 L.Ed. 992, 997, 39 S.Ct. 465, 7 A.L.R. 443] that a manufacturer may “exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.”
 

 [2]
 

 This answer was soon corrected so that the witness’ final testimony was that Coors merely “recommended” the price posted by the distributors.
 

 [3]
 

 As noted earlier, the issue was clearly within the framework of issues to be tried according to the joint pretrial statement.
 

 [4]
 

 The parties as well as this court have proceeded on the assumption that “federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act.”
 
 (Marin County Bd. of Realtors, Inc.
 
 v.
 
 Palsson
 
 (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833].)
 

 [5]
 

 The entire section was held unconstitutional in
 
 Rice
 
 v.
 
 Alcoholic Bev. etc. Appeals Bd.
 
 (1978) 21 Cal.3d 431 [146 Cal.Rptr. 585, 579 P.2d 476]. This holding was triggered by the federal Consumer Goods Pricing Act of 1975 (89 Stat. 801) and is not otherwise relevant to this appeal.
 

 [6]
 

 Section 24755 which in effect amounted to a nonsigner fair trade law
 
 (Samson Market Co.
 
 v.
 
 Alcoholic Bev. etc. Appeals Bd.,
 
 (1969) 71 Cal.2d 1215, 1220 [81 Cal.Rptr. 251, 459 P.2d 667]) must be distinguished from price-posting under Business and Professions Code section 25000.
 

 [7]
 

 There can be no question that in a proper case the Sherman Act applies to combinations to lower prices. (See
 
 Kiefer-Stewart Co.
 
 v.
 
 Seagram & Sons
 
 (1951) 340 U.S. 211, 213 [95 L.Ed. 219, 223, 71 S.Ct. 259].) Under the Cartwright Act the picture is more confused. The prohibited restraints on competition are set forth in overlapping detail in section 16720 of the Business and Professions Code. When enacted in 1907, subdivision (b) of section 16720 defined a “trust” in part as a combination to “increase or reduce" prices. The words “or reduce” were perhaps eliminated by section 1 of chapter 362 of the Statutes of 1909, but the Legislature seems to have had some doubts on that score for the second paragraph of Business and Professions Code section 16701, enacted in 1941, reads as follows: “If the words ‘or reduce’ (following the word ‘increase’) were not effectively deleted from Subdivision 2 of Section 1 of Chapter 530 of the Statutes of 1907 by Section I of Chapter 362 of the Statutes of 1909, a combination of capital, skill or acts by two or
 
 *427
 
 more persons for the purpose of reducing the price of merchandise or of any commodity is a trust.” This strange statutory history is irrelevant, however, since price fixing is prohibited by several other subdivisions of section 16720. For example in
 
 Mailand
 
 v.
 
 Burckle
 
 (1977) 20 Cal.3d 367. 377-378 [143 Cal.Rptr. 1, 572 P.2d 1142], the Supreme Court said of a certain agreement that “this agreement constituted ‘acts by two or more persons’ to fix or establish the price of a commodity within the meaning of section 16720,
 
 subdivision (d)
 
 ....” (Italics added. See also subdivision (e)(4).)
 

 [8]
 

 “. . . . [Coors] has pursued a policy of fixing, controlling and maintaining prices at which Coors beer is sold at both the wholesale and retail level, that in furtherance of this policy it has engaged in various acts and practices such as: suggested resale prices to both distributors and retailers, checking prices at which distributors and retailers sell Coors beer, advising distributors and retailers that it is contrary to Coors pricing policy for them to deviate from prices approved by respondent, threatening to terminate distributorships and threatening to force distributors to sell their businesses for refusing to adhere to suggested retail prices, entering into agreements and understandings with distributors as to the wholesale prices which the distributors will charge for Coors beer, joining with distributors in attempting to coerce retailers to refrain from selling Coors beer at prices below those approved by respondent, encouraging distributors to prevent retail price cutting by refusing to deliver Coors beer to price cutters, or to reduce the amount of beer delivered, and entering into agreements and understandings with retailers as to the retail prices or range of prices at which such retailers will sell Coors beer.” (497 F.2d 1178, at pp.
 
 1185-1186.)
 

 [9]
 

 McCook
 
 v.
 
 Standard Oil Co. of California
 
 (C.D.Cal. 1975) 393 F.Supp. 256 cited by Coors, fails to suggest otherwise. There, the court carved a “small exception" into the offensive use of the doctrine where the defendant had had no right to a jury trial in the first action and the plaintiff, not a party to the first, equitable action, sought to use the equitable decree as a legal sword. The case before us presents no such circumstances.
 

 [10]
 

 Justice White’s opinion in
 
 Blonder-Tongue
 
 v.
 
 University Foundation
 
 (1971) 402 U.S. 313, 328 [28 L.Ed.2d 788, 799, 91 S.Ct. 1434], is incisive: “The cases and authorities discussed above connect erosion of the mutuality requirement to the goal of limiting relitigation of issues where that can be achieved without compromising fairness in particular cases. The courts have often discarded the rule while commenting on crowded dockets and long delays preceding trial. Authorities differ on whether the public interest in efficient judicial administration is a sufficient ground in and of itself for abandoning mutuality, but it is clear that more than crowded dockets is involved. The broader question is whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue. The question in these terms includes as part of the calculus the effect on judicial administration, but it also encompasses the concern exemplified by Bentham’s reference to the gaming table in his attack on the principle of mutuality of estoppel. In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting,
 
 *431
 
 without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant’s time and money are diverted from alternative uses—productive or otherwise—to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff’s allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or ‘a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure.’
 
 Kerotest Mfg. Co.
 
 v.
 
 C-O-Two Co.,
 
 342 U.S. 180, 185 (1952). Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard.” [Fn. omitted.]
 

 [11]
 

 Section 88 refers and incorporates criteria set forth in section 68.1 of the Tentative Draft. We have considered both sections.
 

 [12]
 

 Coors points out that in
 
 Del Rio Distributing, Inc.
 
 v.
 
 Adolph Coors Co.
 
 (5th Cir. 1979) 589 F.2d 176, 178 (petn. for cert, filed, No. 78-1876, June 18, 1979), a panel of the very court which decided
 
 Copper Liquor
 
 upheld a trial court’s refusal to give the
 
 F. T. C.
 
 and
 
 Copper Liquor
 
 judgments preclusive effect, reasoning that it would be inappropriate to do so once
 
 Schwinn
 
 had been overruled. Frankly, we are not persuaded by that court’s narrow legal view of the doctrine of collateral estoppel, even though we think that Coors was bound by the same court’s factual determination that Coors’ territorial restrictions were “ancillary to an illegal price fixing scheme.”