[Civ. No. 43665. First Dist., Div. Three. Mar. 10, 1980.]

DAN BODILY et al., Plaintiffs, Cross-defendants and Respondents, v. PARKMONT VILLAGE GREEN HOME OWNERS ASSOCIATION, INC., Defendant, Cross-complainant and Appellant.

**COUNSEL**

Xavier, Hernandez & Lenahan and Eduardo M. Xavier for Defendant, Cross-complainant and Appellant.

Evelle J. Younger, Attorney General, and Julian O. Standen, Deputy Attorney General, as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Quaresma, Avera, Benya, Hall & Haun and Fred Avera for Plaintiffs, Cross-defendants and Respondents.

OPINION

**WHITE, P. J.**—This case concerns an agreement between the developer (Dan Bodily and Anita Bodily, hereafter referred to in the singular as Bodily) of a residential subdivision (Parkmont Village Green in the City of Fremont) and the homeowners' association (Parkmont Village Green Home Owners Association, Inc., hereafter referred to as the Association) of the subdivision which changed the obligation of Bodily to pay assessments on unsold lots under the covenants, conditions and restrictions of the subdivision. The Department of Real Estate had issued pursuant to the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.) public reports on the subdivision which stated that Bodily would pay assessments on all unsold lots. The trial court entered judgment in favor of Bodily finding that Bodily was not liable to the Association for any unpaid assessments. The Department of Real Estate (hereafter referred to as the Department)[1] and the Association (appellant herein) contend that the agreement was a material change in the subdivision offering in violation of Business and Professions Code section 11012 and materially affected the interests of lot owners in the subdivision in violation of Business and Professions Code section 11018.7.

The instant action was commenced on March 9, 1976, when Bodily filed a complaint for declaratory relief and for an injunction in the Superior Court of Alameda County naming the Department and the Association as defendants. The relief sought against the Association was a judicial declaration that Bodily did not owe the Association $42,435.63, or any sum, for unpaid assessments on lots in the Parkmont Village Green subdivision. The relief sought against the Department was an injunction prohibiting the issue of a cease and desist order restraining Bodily from selling lots in the subdivision until Bodily paid the assessments. The Association filed a cross-complaint seeking payment of assessments "in excess of $42,435.63." After the matter was heard before the trial court (sitting without a jury), findings of fact and conclusions of law were filed and judgment was entered in favor of Bodily on the complaint and cross-complaint.

Since most of the facts of this case are undisputed, the following statement of facts is taken from the stipulated facts in the pretrial order

---

[1] The Department filed an "abandonment of appeal" and later requested and was granted permission to file a brief as amicus curiae in support of the position of the Association on appeal.

and the findings of fact as well as the transcript of the trial. In February of 1971, Bodily commenced the development of a residential subdivision (Parkmont Village Green) in Fremont, California.[2] There were to be a total of 235 dwelling units with each home buyer owning his own unit. All of the land outside of the dwelling units, consisting of lawns, walkways and driveways (hereafter referred to as common areas), was to be owned by the Association. The subdivision was developed in four tracts—3250, 3301, 3310 and 3338.

The plan of development required the creation of a homeowners association to own the common areas, to collect the assessments from the homeowners and to provide for the maintenance of the common areas and the exteriors of the buildings. The plan of development also called for the preparation and recordation of a declaration of covenants, conditions and restrictions, binding each homeowner to the covenants, conditions and restrictions. On February 24, 1971, Bodily recorded the declaration of covenants, conditions and restrictions for tract 3250, the first tract to be developed. The declaration of covenants, conditions and restrictions provided, among other things, that (1) the common area of tract No. 3250 and the exteriors of the dwelling units would be maintained by the as yet uncreated Association; (2) the costs of maintenance would be funded by annual assessments, which could be collected on a monthly basis, levied by the Association on each lot in tract No. 3250; and (3) the assessments were to commence upon the first day of the month following the conveyance of the common area to the Association.

On March 15, 1971, Bodily filed with the Secretary of State of the State of California the articles of incorporation of the Association. The persons named in the articles as the incorporators and the first board of directors of the Association were Bodily and eight other individuals who were either employees or business associates of Bodily.

Bodily submitted an application for a public report for tract No. 3250. The application contained a proposed budget of the Association which estimated the monthly assessment to be $23.20. On April 12, 1971, the Department issued a public report for tract No. 3250 which provides in part "The subdivider must pay assessments on any unsold lots."

The common area in tract No. 3250 was conveyed by Bodily to the Association on July 21, 1971. On July 1, 1971, at a meeting of the

[2]Bodily is an experienced developer who has been engaged in the business for 30 years.

board of directors of the Association a resolution was adopted fixing a monthly assessment of $21 a month per lot in tract No. 3250 with said assessment commencing on August 1, 1971. Beginning August 1, 1971, Bodily paid the assessments on each lot in tract No. 3250 until each lot was sold to a member of the public.

In regards to tract No. 3301, a declaration of annexation to the declaration of covenants, conditions and restrictions was recorded on May 21, 1971; and the common area in tract No. 3301 was conveyed by Bodily to the Association on October 29, 1971. On November 15, 1971, the board of directors of the Association also fixed the monthly assessment for the lots in tract No. 3301 at $21 with said assessment commencing on December 1, 1971. Bodily paid the assessment on each lot in tract No. 3301 until each lot was sold to a member of the public.

The common areas of tract Nos. 3310 and 3338 were conveyed to the Association on March 8, 1972 and December 4, 1973, respectively. A declaration of annexation to the declaration of covenants, conditions and restrictions was recorded on September 16, 1971, for tract No. 3310 and on April 20, 1973, for tract No. 3338. Bodily also submitted applications for public reports for tract Nos. 3310 and 3338. Each of the public reports issued for tract Nos. 3310 and 3338 provides in part, "The subdivider must pay assessments on any unsold lots."

By February of 1972 many units in tract Nos. 3250 and 3301 had been sold and were occupied by the purchasers of the units. On February 25, 1972, a meeting of the homeowners was held and a new board of directors for the Association was elected. The new board of directors consisted of six homeowners, Bodily and two of his employees, John West and A. G. Lancaster. West and Lancaster did not attend any subsequent meetings of the board of directors.

On March 9, 1972, the new board of directors held a meeting and elected new officers; Bodily was not elected to any office. At this meeting Bodily and the Association entered into an oral agreement concerning Bodily's obligation to pay assessments for the units in tract No. 3310 and the then proposed tract No. 3338. Since the legality of this agreement is contested in the instant appeal, it is necessary to set out the substance of the agreement.[3] Under the agreement (1) Bodily, at his

---

[3]The existence of the oral agreement was contested by the Association in the trial court. However, the trial court found that the agreement existed. On appeal the Association does not contend that the evidence does not support this finding.

expense, would assume the Association's responsibility to maintain the common areas in tract Nos. 3310 and 3338 until such time as the dwelling units were completely constructed and ready for occupancy; (2) the Association's maintenance responsibilities would commence only after the board of directors of the Association had inspected the dwelling units and accepted them as ready for occupancy; and (3) in return for Bodily's assumption of the Association's maintenance responsibilities, the Association would not levy the monthly assessments of $21 on lots in tract Nos. 3310 and 3338 until the dwelling units therein had been accepted by the Association.

Bodily testified that at the time the agreement was executed it was estimated that it would cost him approximately $13.25 a lot a month to carry out his obligations under the agreement.

The proposed budget for the Association contained in the application for public reports for tract Nos. 3310 and 3338 submitted by Bodily included $4 a month a lot for "Exterior Building Maintenance" and $4 a month a lot for "Miscellaneous Contingencies." The Association called as a witness William Kewley, deputy commissioner with the Department of Real Estate, who testified that since new subdivisions do not require extensive exterior building maintenance and have few expenditures for unanticipated contingencies, the purported agreement deprived the Association of a surplus that could have been used to establish a reserve for future expenses. Kewley testified that subdivisions require reserves because maintenance costs typically increase sharply with the age of the subdivision and concluded that the purported agreement was not in the best interests of the Association.

### Business and Professions Code Section 11012

The Association and the Department argue that the agreement is contrary to the provisions of Business and Professions Code section 11012. Section 11012 provides: "It is unlawful for the owner, his agent, or subdivider, of the project, after it is submitted to the Department of Real Estate, to materially change the setup of such offering without first notifying the Department of Real Estate in writing of such intended change. This section only applies to those changes of which the owner, his agent, or subdivider has knowledge or constructive knowledge." The Department was not notified of the agreement in question.

Bodily first contends that Business and Professions Code section 11012 does not apply to the agreement in question because the statute is directed to the owner, his agent or the subdivider and "[n]othing therein purports to prevent the Homeowners Association, of its own free will, from making such changes." The Association in the instant case did not make a unilateral decision to change the method of levying assessment against the lots in tract Nos. 3310 and 3338. The decision was reached only after Bodily, the subdivider, and the Association entered into an agreement. ■ Since Bodily was a participant in the agreement, there is no question but that the statute applies insofar as this requirement is concerned.

Bodily next states that section 11012 only applies to material change and argues that the agreement "did not materially change anything, but was merely the method adopted by the Board of Directors to carry out their duty to provide for the maintenance of the common areas."

In *Barrett* v. *Hammer Builders, Inc.* (1961) 195 Cal.App.2d 305 [16 Cal.Rptr. 49], the defendants (subdividers) submitted an application for a public report which described the type of buildings that would be constructed on the lots and stated that the lots would be sold by grant deeds. After the issuance of the public report, the defendants, without notifying the Real Estate Commissioner, constructed a different type of building on the lots and sold the lots by sales contracts. Plaintiff, a lot purchaser, brought an action to rescind his purchase. The court ruled in plaintiff's favor on the ground that defendants had violated Business and Professions Code section 11012 stating: "Section 11012 of the Business and Professions Code requires the subdivider to notify the commissioner of *any* changes in the offering. It is clear that the legislative purpose of protecting the public would not be effectuated by permitting a subdivider to circumvent the legislative mandate." (*Id.*, at p. 310, italics added; see also *Murphy* v. *San Gabriel Mfg. Co.* (1950) 99 Cal. App.2d 365, 367-368 [222 P.2d 85].)

One of the main functions of the board of directors for the Association was to provide for the maintenance of the common areas. The manner in which the board of directors obtained the necessary funds to carry out this obligation was by levying assessments. ■ Any change that affected this scheme can only be termed a material change.

Furthermore, since the agreement applied to the lots on which the buildings were under construction, few expenditures were required for

either exterior building maintenance or miscellaneous contingencies. The agreement deprived the Association of an opportunity to build a financial reserve to cover the additional expenses that would arise as the subdivision ages. The trial court's finding of fact that the agreement was not detrimental to the Association is not supported by substantial evidence. Substantial evidence means evidence that is "reasonable in nature, credible, and of solid value;..." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) All evidence of solid value in the instant case demonstrates that under the terms of the agreement, the Association was prevented from accumulating a substantial reserve for future expenses.

Bodily next contends that there was no change in the "setup of the offering," material or otherwise. Bodily correctly states that "the offering" must be construed to mean the terms upon which the dwelling units were offered for sale to the public. Bodily asserts that the purchasers of the units in the subdivision were in no way affected by the subject agreement. The Association's financial ability to meet its obligation to maintain the exterior of the buildings could well have been affected by the agreement. A purchaser of a unit would certainly be affected by the agreement if the result of the agreement was an Association that is not as financially stable as it would have been if there were no agreement.

The Association and the Department also argue that the agreement is contrary to the provisions of Business and Professions Code section 11018.7, subdivision (a), which provides: "No amendment or modification of provisions in the declaration of restrictions, bylaws, articles of incorporation or other instruments controlling or otherwise affecting rights to ownership, possession or use of interests in subdivisions as defined in Sections 11000.1 and 11004.5, which are not also land projects as defined in Section 11000.5, which would materially change such rights of an owner, either directly or as a member of an association of owners, is valid without the prior written consent of the Real Estate Commissioner during the period of time when the subdivider or his successor in interest holds or directly controls as many as one-fourth of the votes that may be cast to effect such change."

Since we have determined that the agreement is in violation of Business and Professions Code section 11012, it is unnecessary to decide if the agreement is also in violation of Business and Professions Code section 11018.7.

## In Pari Delicto

By its cross-complaint the Association sought to recover the unpaid assessments from Bodily. The trial court concluded that, even if the purported agreement were unlawful, the cross-complaint was barred by the doctrine of *in pari delicto*.

The doctrine of *in pari delicto* (in equal fault) refers to "the general rule that the courts will deny relief to either party who has entered into an illegal contract or bargain which is against public policy." (*Tri-Q, Inc.* v. *Sta-Hi Corp.* (1965) 63 Cal.2d 199, 216 [45 Cal.Rptr. 878, 404 P.2d 486].) However, there are several exceptions to the general rule and the following exception is particularly applicable to the instant case: "It is true that when the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another, a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction. The protective purpose of the legislation is realized by allowing the plaintiff to maintain his action against a defendant within the class primarily to be deterred. In this situation it is said that the plaintiff is not *in pari delicto*." (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 153 [308 P.2d 713]; see also *Homestead Supplies, Inc.* v. *Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 992 [147 Cal.Rptr. 22].)

The legislative purpose of the Subdivided Lands Act is to protect individual members of the public who purchase lots or homes from subdividers. (*Pratt* v. *Adams* (1964) 229 Cal.App.2d 602, 605-606 [40 Cal. Rptr. 505]; *Barrett* v. *Hammer Builders, Inc., supra*, 195 Cal.App.2d 305, 308.) Section 11012 of the Business and Professions Code does not proscribe any conduct on the part of purchasers, but is directed at the conduct of the subdivider. Under these circumstances the Association (of homeowners) is not *in pari delicto*.

## Laches

Bodily contends that the trial court properly found that the Association could not recover because of laches. The agreement was entered into in March of 1972 and it was not until January of 1976 that the board of directors of the Association objected to or made any attempt to repudiate the agreement. The trial court found that this delay preju-

diced Bodily in that he "would not have paid the expenses of the maintenance of said common areas except in the belief that said agreement was in continuing effect."

The Association's cross-complaint was for money damages. ■ When an action is for money damages (a legal action), the equitable defense of laches is not available. (*Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 461 [326 P.2d 484]; *Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 752 [192 P.2d 935]; *Weber* v. *Marine Cooks' & Stewards' Assn.* (1954) 123 Cal.App.2d 328, 332 [266 P.2d 801].) It should also be noted that laches was not specially pleaded. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 947, pp. 2526-2527.) Although a failure to plead laches is not a bar to the trial court finding that laches is present, it is difficult to tell in the instant case if the trial court applied laches to the declaratory relief action or the cross-complaint. The doctrine of laches should not be applied to the instant case. If the doctrine of laches is applied, the legislative purpose in enacting Business and Professions Code section 11012 would be to no avail.

At the trial level, the court only determined liability. Since the trial court determined that Bodily was not liable to the Association because of the agreement, the issue of damages was not litigated. It would appear that whether the Association should recover the entire $21 a month a lot, or recover a lesser amount because Bodily did maintain the common areas, is an issue that should be litigated in the damage phase of the proceeding. If it is determined that the Association should not recover the entire $21, it is possible that Bodily may not have been prejudiced by any delay in the Association's assertion of its rights. "Delay is not a bar unless it works to the *disadvantage or prejudice* of other parties." (7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 15, p. 5240.)

The judgment is reversed.

Scott, J., and Takei, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.