790 F.2d 775
 SOMERSET IMPORTERS, LTD., dba San Martin Winery & Somerset
Wine Company, Plaintiff-Counterclaim/Defendant-Appellee,
v.
CONTINENTAL VINTNERS, Defendant-Counterclaimant/Appellant.
 No. 85-5926.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 7, 1986.
Decided May 28, 1986.
 
 Paul M. Zieff, Landels, Ripley, & Diamond, San Francisco, Cal., for defendant-counterclaimant/appellant.
 Bertran Fields, Garrett L. Hanken, Greenberg, Glusker, Fields, Claman, & Machtinger, Los Angeles, Cal., for plaintiff-counterclaim/defendant-appellee.
 On Appeal From the United States District Court for the Central District of California.
 Before SCHROEDER and BEEZER, Circuit Judges, and JAMESON,* District Judge.
 BEEZER, Circuit Judge:
 
 
 1
 This case involves California's regulation of winegrape purchase contracts. Continental Vintners, a winegrape grower, appeals the district court's summary judgment in favor of Somerset Importers, Ltd., a grape processor. The district court held that section 55601.5(g) of the California Food and Agriculture Code rendered a contract between Somerset and Continental unenforceable.[1] We affirm.I
 
 FACTS
 
 2
 In 1978, Continental and Somerset entered into a grape purchase agreement. The contract provided that Continental would supply Somerset with specified tonnages of wine grapes during the following five years. The contract specified that the prices would be "based upon the Federal-State Market News and/or Final Grape Crush Report by the California Department of Food and Agriculture, whichever is greater."
 
 
 3
 In 1981, Continental and Somerset modified the agreement, in part to comply with California law. The 1981 agreement provided in relevant part that
 
 
 4
 (5) The price for each variety of grapes shall be the fair market value thereof determined as of each January 10 subsequent to the year of harvest....
 
 
 5
 (8) Although the prices established by this agreement shall be fair market value of January 10 of each year, for purposes of determining such fair market value, it shall be presumed, subject only to clear and convincing evidence to the contrary, that the per ton value of each variety of grapes shall be ... [t]he average for each respective variety ... as reported in ... the Preliminary Grape Crush Report issued each year by the California Department of Food and Agriculture, based upon tonnage prices on or before January 10 of each year.
 
 
 6
 The 1981 agreement also provided that Continental would supply Somerset through 1986.
 
 
 7
 In January of 1982, Somerset indicated that it would not fulfill its obligations to purchase under the 1981 agreement. Continental sued in state court and in 1982 the parties settled their differences. The 1982 settlement agreement provided that Continental would dismiss its complaint without prejudice and Somerset would agree to purchase certain tonnages of grapes. The 1982 agreement also provided that in the event of a material breach by Somerset, Continental could reassert its claims under the 1981 agreement.
 
 
 8
 In April of 1983, Somerset filed a diversity action in district court seeking a declaratory judgment that the 1982 agreement was illegal and unenforceable. Continental counterclaimed, alleging breach of the 1981 agreement. The district court held that the 1981 and 1982 agreements violated section 55601.5(g) of the California Food and Agriculture Code and, therefore, were illegal and unenforceable by either party. Consequently, the court granted summary judgment for Somerset on Continental's counterclaim. Continental appeals.
 
 II
 STANDARD OF REVIEW
 
 9
 We review the district court's grant of summary judgment de novo. International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985). We review the district court's interpretation of state law de novo. In re McLinn, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc).
 
 III
 THE PROTECTED CLASS ARGUMENT
 
 10
 First, Continental argues that section 55601.5 is especially intended to protect growers. Continental contends that it is a member of a protected class and that the statute should be construed to protect a grower's interest. However, an examination of the language of the statute and its legislative history reveals that Continental seeks the protections of a regulatory scheme while acting in a manner that tends to defeat the value of the regulations for other growers. In the long run, refusal to enforce agreements that fail to comply with the statutory scheme will promote the ends intended by the legislature.
 
 
 11
 The language of section 55601.5(g) is plain: all grape purchase contracts shall provide for a final price to be set on or before the January 10 following delivery of the grapes; any contract that fails to comply is illegal and unenforceable. To read section 55601.5(g) otherwise is to torture its plain language. Nothing in the language of section 55601.5(g) suggests that a deficient contract is voidable by a grower but not by a processor.
 
 
 12
 Moreover, the legislative history of section 55601.5 does not reflect any intent to allow enforcement of illegal grape purchase contracts by growers.[2] To the contrary, the few references to the unenforceability of noncomplying contracts suggests an intent to regulate growers and processors equally in this regard. For instance, the Legislative Analyst's Report regarding the final amended version of section 55601.5 (Senate Bill 1609 of 1976) states:
 
 
 13
 This bill expands the regulation by the Director of Food and Agriculture of contracts between grape growers and processing plants which crush grapes. It ... [m]akes contracts entered into between grape growers and processors without final prices unenforceable.
 
 
 14
 (emphasis added). The remaining references in the legislative history are similarly neutral regarding which party is to bear the burden of noncompliance.
 
 
 15
 Imposing the risk that a contract will be unenforceable on both grower and processor actually promotes the regulatory scheme and the legislature's intent. Prior to the adoption of section 55601.5 in 1976, California allowed growers and processors to adopt any number of price determination or payment schemes. The law merely required processors to abide by the terms of their contracts. See Cal.Agric.Code Sec. 55601 (West 1968). The analysis of the original version of SB 1609 by the Committee on Agriculture and Water Resources of the California Senate reflects substantial dissatisfaction with the confusion resulting from such unregulated pricing practices:
 
 
 16
 It is understood there is no standard contract between vintners and growers. Some, for example, may provide for payment of 50% on delivery and the balance on 15 March. Others may provide for payments of 90% by 1 January following delivery with the balance at a later date. Still others provided that the grapes shall be paid for on the basis of weighted average price paid by variety and by district as reported by the Market News Service and the Crop and Livestock Reporting Service.
 
 
 17
 To remedy the situation, the legislature undertook to regulate pricing practices. The linchpin of the regulatory scheme is the deadline for establishing the final price of grapes. By setting a deadline and requiring the processors to report prices, the legislature promoted two of the growers' goals: first, the time limits hasten payment to the growers, and second, the time limits enable the Department of Agriculture to prepare complete and accurate reports regarding the wine grape market in California.[3]
 
 
 18
 To the extent that section 55601.5 seeks to secure reliable market information, it benefits all growers. Indeed, it appears to benefit the industry as a whole. Failure to furnish timely information reduces the accuracy of the reports upon which the entire industry relies. The legislature reasonably could have concluded that the best way to insure timely reporting was to place the risk of unenforceability on each party to the contract; because each party presumably would desire to protect the benefit of its bargain, each would have incentive to make sure the contract was enforceable.[4] Moreover, the legislature reasonably might have found that imposing the burden of compliance on the parties would save the state the cost of monitoring compliance.
 
 
 19
 Finally, a comparison with at least one other agricultural statute indicates that when the legislature intends only one party to bear the burden of an illegal contract, the legislature will command this result explicitly. When the legislature enacted section 55601.5, sections 62801-62803 of the California Agriculture Code regulated contracts between buyers and sellers of edible nuts.[5] Those sections explicitly imposed the burden of noncompliance with statutory requirements only on the purchasers of edible nuts. The legislative history of section 55601.5 expressly refers to section 62801 as precedent for regulating contractual pricing practices. If the legislature had intended section 55601.5(g) to preclude enforcement of illegal contracts only by processors, it seems likely that the legislature would have structured section 55601.5(g) similarly to section 62802.
 
 
 20
 Therefore, it is entirely reasonable to read the plain language of section 55601.5(g) literally. To the extent that section 55601.5(g) creates a harsh result, such was the legislature's intent.[6]
 
 
 21
 Continental cites a number of California cases for the proposition that a member of a protected class may maintain an action notwithstanding an express legislative declaration of unenforceability. None of the cases upon which Continental relies supports Continental's position.
 
 
 22
 In Lewis & Queen v. N.M. Ball Sons, 48 Cal.2d 141, 308 P.2d 713 (1957), a statute provided that an unlicensed contractor or subcontractor could not bring an action to collect compensation. 308 P.2d at 717. The plaintiff, an unlicensed subcontractor, argued that it was a member of a protected class and that the statutory prohibition, therefore, was inapplicable. 308 P.2d at 720. The court recognized that
 
 
 23
 It is true that when the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another, a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction. The protective purpose of the legislation is realized by allowing the plaintiff to maintain his action against a defendant within the class primarily to be deterred. In this situation it is said that the plaintiff is not in pari delicto.
 
 
 24
 308 P.2d at 720. Nevertheless, the court rejected plaintiff's argument on the grounds that the protected class comprised those who dealt with persons required by the statute to have a license. The court also reasoned that the statute sought to deter unlicensed persons from engaging in contracting. 308 P.2d at 721.
 
 
 25
 Continental asserts that the quoted passage from Lewis & Queen indicates that a member of a protected class may avoid an express legislative declaration of unenforceability. We disagree. The California Supreme Court's discussion of protected class principles did not occur in a vacuum. The court was able to determine the boundaries of the "protected" and "deterred" classes only by reference to the statute. The statute in Lewis & Queen expressly provided that those in violation of the statute could not bring suit. The Lewis & Queen court gave effect to the statutory prohibition. The statutory prohibition itself embodied and controlled the general common-law principles that the court discussed.
 
 
 26
 Similarly, in Bodily v. Paramont Village Green Home Owners Association, 104 Cal.App.3d 348, 163 Cal.Rptr. 658 (1980), the California Court of Appeals looked to the plain language of a statute to determine whether a party to a contract could avoid its obligations on the grounds that the contract was illegal and unenforceable. In Bodily, a statute prohibited a real estate subdivider from altering the terms of the subdivision offering without first notifying the Department of Real Estate. 163 Cal.Rptr. at 662. Without notifying the Department, the subdivider and the homeowners' association agreed to modify the terms of the offering. 163 Cal.Rptr. at 661. When a dispute arose, the homeowners' association sought to enforce the terms of the original offering. The court of appeals rejected the subdivider's defense of in pari delicto and enforced the terms of the original offering. 163 Cal.Rptr. at 663-64.
 
 
 27
 Bodily does not assist Continental for a variety of reasons. First, the statute at issue in Bodily expressly prohibited conduct by the subdivider; the statute did not govern the association's conduct. Second, the statute did not state expressly that contracts which violate the statute were void. The court apparently applied the common-law doctrine of illegality to render the contract void. See 163 Cal.Rptr. at 662. The court rejected the subdivider's in pari delicto argument on the basis that the statute placed the homeowners' association in a protected class. 163 Cal.Rptr. at 663. Protecting the association, therefore, did not contravene an express legislative declaration of unenforceability. Third, the homeowners' association did not seek to enforce the illegal agreement, but rather to avoid it. The association successfully enforced the terms of the original offering, which was unquestionably legal. Therefore, the court in Bodily gave effect to the plain language of the statute.
 
 
 28
 Continental's reliance on Homestead Supplies, Inc. v. Executive Life Insurance Co., 81 Cal.App.3d 978, 147 Cal.Rptr. 22 (1978), is similarly misplaced. In Homestead Supplies, a statute prohibited insurance agents from offering rebates to induce the purchase of insurance and prohibited insureds from knowingly accepting unlawful rebate. 147 Cal.Rptr. at 26. The statute provided that a violation constituted a misdemeanor. The plaintiff purchased life insurance from the defendant's agent. When the policy arrived, the plaintiff found that the annual premium schedule stated higher rates than those quoted by the agent. The defendant agreed to stand by the agent's representations and reduce the premiums. However, the defendant later billed the plaintiff at the higher rate. Plaintiff sued to enforce the modified insurance contract. The court of appeals accepted arguendo defendant's assertion that the modification constituted an illegal rebate. Nevertheless, the court enforced the modified contract in favor of the plaintiff.
 
 
 29
 Continental correctly points out that the Homestead Supplies court relied on the common-law doctrine of illegality. Because the plaintiff was not in pari delicto with the defendant, the court allowed the plaintiff to enforce the contract. We note, however, that the Homestead Supplies court did not ignore an express statutory mandate by applying common-law principles; the statute was silent regarding the effect of illegality on the enforcement of a contract.[7]
 
 IV
 THE SEVERABILITY ARGUMENT
 
 30
 Second, Continental argues that we should sever the portions of the 1981 agreement that violate section 55601.5(g).
 
 
 31
 Relying on the authority of Mailand v. Burckle, 20 Cal.3d 367, 143 Cal.Rptr. 1, 572 P.2d 1142 (1978), Continental contends that express statutory language providing that a contract is unenforceable because of illegality does not necessarily render the entire contract unenforceable. In Mailand, the plaintiff was a franchisee of the defendant. The franchise comprised a retail dairy and gasoline station. The franchise agreement provided, inter alia, that the defendant could set the retail price at which plaintiff sold gasoline. The California Supreme Court found that the price fixing provision violated California's antitrust laws. Defendants argued that if the price-fixing provision violated the antitrust laws, the entire franchise agreement was illegal and void. The court rejected defendant's argument, reasoning that "[t]he rule is settled that partially illegal contracts may be upheld if the illegal portion is severable from the part which is legal." 143 Cal.Rptr. at 11, 572 P.2d at 1152. Several factors, however, preclude resort to the severance device.
 
 
 32
 Section 55601.5(g) imposes an affirmative obligation on the parties to a grape purchase contract to include a provision that requires the final price to be set on or before January 10. The law in existence prior to the adoption of section 55601.5 supplied pricing and payment terms in the face of contractual silence regarding these terms. See Cal.Agric.Code Sec. 55601 (West 1968); Cal.Comm.Code Sec. 2305. The legislature found the confusion and uncertainty in the wine grape industry intolerable. Therefore, the legislature mandated compliance with stated timetables. The requirement that all grape purchase contracts contain a proper pricing provision was calculated to avoid the uncertainty inherent in the implication of pricing and payment terms by operation of law. Consequently, contractual silence violates section 55601.5(g).
 
 
 33
 Apparently recognizing that the severance of all pricing provisions would leave the contract unenforceable, Continental urges us to sever only the provisions of paragraph 8. Such an approach would be improper and, in any event, insufficient to save the contract.
 
 
 34
 What Continental desires is not severance but reformation. The parties expressly undertook to define the meaning of fair market value. Their definition equates fair market value with the prices published in the Preliminary Grape Crush Report. Continental now seeks to clothe the term "fair market value" with a different meaning. The "severance" device, however, does not permit courts to reform the express terms of a contract. Restatement (Second) of Contracts Sec. 183, comment b (1981); see id. Sec. 178 comment a, illustration 3.
 
 
 35
 Moreover, allowing Continental to reform the illegal provisions would defeat the purpose of section 55601.5(g). Section 55601.5(g) provides an incentive to growers and processors to enter into contracts that require timely performance. If section 55601.5(g) condemns a contract that is silent regarding the time for prices to be determined, a fortiori it condemns a contract that openly commits the parties to tardy performance. Enforcement of such a contract would eviscerate section 55601.5(g).
 
 
 36
 Even if we were inclined to "sever" paragraph 8, the language of paragraph 5 is insufficient to comply with the affirmative requirements of section 55601.5(g). Continental asks us to believe that Somerset could ascertain the fair market value as of January 10 on or before January 10. This assertion is inherently incredible. Somerset has no right of access to the market information compiled by the Department of Agriculture. See Cal.Food & Agric.Code Sec. 55601.5(d) (West Supp.1986). It is unreasonable to believe that Somerset could otherwise obtain enough reliable information in one day to arrive at a credible determination of fair market value. Continental's strained construction of paragraph 5 reinforces our conclusion that severance of the terms contained in paragraph 8 would alter the intentions of the parties substantially.
 
 V
 CONCLUSION
 
 37
 We construe section 55601.5(g) to mean what it says: noncomplying contracts are unenforceable. We read the 1981 contract to mean what it says: the price will be determined by reference to the Preliminary Grape Crush Report. We will not rewrite the statute or the contract. Therefore, we affirm the district court's conclusion that the 1981 contract is unenforceable.
 
 
 38
 AFFIRMED.
 
 
 
 *
 The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 Section 55601.5 provides:
 (a) Notwithstanding Section 55461, on or before January 10 of each year, every processor who crushes grapes in California shall furnish to the director, on forms provided by the director, a report of the total number of tons of grapes purchased by such processor in California during the preceding crush within each grape pricing district. In the report such tonnage shall be broken down by variety, price, including any bonuses or allowances, and sugar calculations. Every such processor shall also furnish the director, on forms provided by the director, a report of the total number of tons of each variety of grapes crushed during the preceding crush and the average sugar content of each variety within each grape pricing district.
 (b) On or before February 25 of every year, each processor who crushes grapes in California shall furnish the director information concerning the final prices, including any bonuses or allowances, paid by variety and grape pricing district to all growers holding reference price contracts in effect prior to January 1, 1977, which payments have not been reported on January 10.
 (c) "Grape pricing districts," as used in this section, shall be those districts used by the federal-state cooperative news services, as provided in Section 58231.
 (d) The director may not release or otherwise make available any information furnished by an individual processor under this section, except in proceedings brought against such processor by the director for the purpose of enforcing the provisions of this section, or in the case of a producer who holds any reference price grape purchase contract, to whom there may be furnished, upon request and at a reasonable cost, the information needed to verify the reference price, including any bonuses or allowances, set forth in the contract.
 (e) The director shall enforce the collection of such information and shall, on or before February 10 of each year, publish a preliminary summary report on the preceding crush. Such report shall include: (1) the weighted average price paid on the basis of the prices, including any bonuses or allowances, reported and average sugar content for each grape variety purchased within each grape pricing district; (2) the total number of tons of grapes crushed and the average sugar content for each grape variety within each grape pricing district; and (3) each price category paid, separated by sugar calculations, if any, and the percentage each represents of the total for each variety within each grape pricing district. On or before March 10 of each year, the director shall publish a final summary report, which report shall contain all of the data furnished by the processors on or before January 10 and on or before February 25 of each year covering purchases under reference price contracts.
 (f) The forms provided to processors by the director pursuant to this section shall provide for the separate reporting of grapes used by a processor (1) as distilling material and (2) for both beverage brandy and other than beverage brandy. A processor shall report all grapes used as distilling material by variety. The director, in determining the weighted average price paid for each grape variety purchased within each grape pricing district, shall not include the prices paid for grapes of any variety used as distilling material for other than beverage brandy in determining such weighted average price. The director's report shall include a separate summary regarding grapes used by processors as distilling material.
 (g) All grape purchase contracts entered into on or after January 1, 1977, shall provide for a final price, including any bonuses or allowances, to be set on or before the January 10 following delivery of the grapes purchased. Any grape purchase contract entered into in violation of this provision is illegal and unenforceable. For the purpose of this section, a grape purchase contract shall not include any existing supply contract between a nonprofit cooperative association and a commercial processor.
 (h) If the director finds that any processor has failed, refused, or neglected to provide the information required herein, the director may proceed in accordance with Sections 55721 and 55722.
 (i) The willful failure of any processor to report to the director, as required by this section, shall constitute a violation of this chapter and shall be a separate and distinct violation of this chapter for each day such processor fails to meet such reporting requirements.
 Cal.Food & Agric.Code Sec. 55601.5 (West Supp.1986).
 
 
 [2]
 Our reference to the legislative history is to those documents compiled by the California Legislative Intent Service and presented by Continental to the district court
 
 
 [3]
 We note as an aside that the legislative history indicates that the growers expressed dissatisfaction with the lack of reliable pricing information. The growers comprised the main force behind the adoption of section 55601.5
 
 
 [4]
 Conversely, allowing a grower to enforce an illegal contract might encourage a grower to enter into an illegal contract with the intent to assert its unenforceability if the market later becomes a strong seller's market
 
 
 [5]
 Sections 62801-62803 provided:
 Sec. 62801 Writing; contents
 Except as otherwise provided in Section 62803, every contract for the sale of edible nuts which are not in actual existence or ready for immediate delivery shall be in writing and shall state the full purchase price which is to be paid in accordance with the terms of the contract. It shall state the price in a definite sum and, if the price is to be paid upon the basis of units of weight or measure, shall specify or describe such unit and state the full unit price.
 Cal.Agric.Code Sec. 62801 (West 1968), amended, Stats.1983, C. 651, p. ----, Sec. 1, eff. Sept. 7, 1983, Cal.Food & Agric.Code Sec. 62801 (West supp.1986).
 Sec. 62802 Penalty for nonconforming contract
 Any purchaser of edible nuts which are delivered pursuant to a contract in violation of this article is liable to the seller for the reasonable value of such nuts as of the time of delivery and, in addition, is liable to the seller for a penalty of twice the reasonable value of such nuts.
 Cal.Agric.Code Sec. 62802 (West 1968), amended, Stats.1983 c. 651, p. ----, Sec. 2, eff. Sept. 7, 1983, Cal.Food & Agric.Code Sec. 62802 (West supp.1986).
 Sec. 62803 Exemptions
 This article is not applicable to any contract between any member of any cooperative agricultural marketing associating ...
 Cal.Agric.Code Sec. 62803 (West 1968).
 
 
 [6]
 We note that if the tables were turned and Continental were asserting section 55601.5(g) to avoid the terms of the contract, the result would be equally harsh
 
 
 [7]
 The remaining cases upon which Continental relies are no more helpful to Continental than the cases discussed above. See Tri-O, Inc. v. Sta-Hi Corp., 63 Cal.2d 199, 404 P.2d 486, 45 Cal.Rptr. 878 (1965); Fairlane Estates, Inc. v. Carrico Construction Co., 228 Cal.App.2d 65, 39 Cal.Rptr. 35 (1964). Further elaboration is unwarranted