[No. F014350. Fifth Dist. May 30, 1991.]

PJNR, INC., et al., Plaintiffs and Respondent.
DEPARTMENT OF REAL ESTATE, Defendant and Appellant.

## COUNSEL

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Timothy G. Laddish, Assistant Attorney General, James B. Cuneo and Steven J. Green, Deputy Attorneys General, for Defendant and Appellant.

Wild, Carter, Tipton & Oliver and Russell G. Van Rozeboom for Plaintiffs and Respondents.

OPINION

STONE (W. A.), Acting P. J.—

THE FACTS AND PROCEEDINGS

In December 1984, the Department of Real Estate (DRE) issued a "Planned Development Final Subdivision Public Report" (public report) for the Millerton Lake Mobile Home Village (development) for the purpose of informing potential purchasers about the respective rights and responsibilities of the subdivision developer (developer) and lot owners. The public report identified the developer as "FORTUNE, INC. & ROCCA-GREEN INC." A subsequent amendment to the report identified the developer as "PJNR, Inc." The report reflected the development was a common-interest subdivision in which lot owners obtained an interest in common areas and facilities to be owned and operated by the Millerton Lake Mobile Home Association (Association). Membership in the Association was mandatory upon the purchase of a lot. The report advised that the developer would control the affairs of the Association until there was a sufficient number of purchasers to elect a governing body for the Association.

With respect to maintenance and operation expenses of the Association, the public report stated the developer had submitted a budget for maintenance and operation of common areas and for long-term reserves, the budget had been reviewed by the DRE, and purchasers should obtain a copy from the subdivider.

The budget contained an itemized estimate of income and expenses which broke down specific costs into five general categories: fixed costs, operating costs, reserves, administrative costs and contingency. With respect to the costs payable from reserves, the budget included a specific list of items which included roofing, carpeting, painting and several other long-term maintenance items. The other four categories of costs were equally specific and identified numerous items to be paid from the budget.

The public report established monthly assessments to fund the budget at $63.16 per occupied lot per month and $45.32 per unsold or vacant lot per month, with the developer responsible for assessment payments on unsold or vacant lots. It designated $7.89 from each assessment for reserves. The

public report emphasized that reserves were not to pay for current operating expenses and any increase or decrease in assessments made in accordance with the covenants, conditions and restrictions or bylaws of the Association could not affect amounts attributable to reserves.

The public report stated the developer had entered into an agreement with the Association[1] to perform or pay certain of the maintenance and other expenses which were normally the duty of the Association. The expenses to be subsidized in this manner by the developer were identified as insurance, electricity, landscape area, private streets and driveways, motorized gate, minor repairs, management, legal services, accounting, and miscellaneous office expenses. These expenses are referred to as subsidy items. The effect of the agreement was to reduce the monthly assessments by $36.84 per lot. The agreement provided the developer would prepare and submit to the Association a monthly accounting "containing the description and valuation of all goods and services for the COMMON AREA furnished directly by the DEVELOPER or contracted and paid by DEVELOPER pursuant to this Subsidy Agreement." For each lot the term of the subsidy agreement was to commence essentially upon the sale of the first lot and terminate at the end of two years, unless terminated by the Association for cause upon 60 days' written notice.

In May 1987, an elected board of directors of lot owners assumed operation of the Association. A review of the books of the Association revealed the developer had not performed according to the terms of the subsidy agreement. The Association sent a letter to the developer explaining the books reflected that no reserve account had been established, no assessment payments had been made on model homes and vacant lots from March 1985 to March 1987 and money from the Association account had been used to pay for subsidy items. According to the Association's calculations, the developer owed a total of $33,125.02.

The developer conceded there had been some mistakes in its operation of the Association, including its failure to establish a reserve account, its failure to provide a monthly accounting of subsidy items and its payment of subsidy items with Association funds rather than developer funds. The developer claimed the original budget was incorrect because it failed to include several items and underestimated costs for other items. With respect to the failure to pay monthly assessments on unsold or vacant lots, the developer claimed the assessments were "paid" when it disbursed $32,770.14 from its account to pay for nonsubsidy items—items chargeable to the Association and not

---

[1] This "agreement," identified as an "In-Kind Subsidy Agreement" (subsidy agreement), was filed with the DRE in November 1984 prior to the issuance of the public report and before the existence of a homeowners association.

adequately covered in the budget. The developer conceded the assessments should have been deposited into the Association's account and then disbursed by the Association to pay these items. The developer agreed to deposit $7,055.95 into an escrow account to reimburse the Association for funds used to pay for subsidy items chargeable to the developer. The escrow officer would be instructed to release the funds when the Association sent a letter stating the developer had paid assessments in full. The developer agreed to deposit into the escrow account $15,117.28 to reimburse the Association for unpaid assessments if the Association agreed to deposit into escrow the $32,770.14 which the developer claimed to have spent on nonsubsidy items chargeable to the Association. The developer refused to pay late charges and interest since assessments had been "overpaid." Finally, although the developer admitted a reserve account had not been established, it claimed there was in fact $5,000 in a reserve account.

A DRE audit of the Association covering the period March 1985 to November 1987 concluded the developer should have paid a total of $25,888.64 in assessments, but had paid only $5,278.39. It also concluded $8,602.57 had been disbursed from the Association's account for items that should have been paid by the developer. The audit identified and discussed numerous payments or services the developer claimed it provided to the Association which totaled $32,770.14—about $20,000 of which "may or may not have been the responsibility" of the Association. It also noted the minutes of the meetings of the Association did not reflect authorization for expenditures of funds which were not contained in the budget.

Association members disagreed about how to proceed against the developer. The board of directors of the Association (Board) investigated the developer's claims and established a committee to review the developer's records. A certified public accountant conducted an independent audit. Both investigations reached the conclusion the developer "overpaid" by approximately $20,000. The Board sought the advice of an attorney who advised the developer was legally entitled to an "offset" for the amount he "overpaid." The attorney also explained that prosecuting a lawsuit against the developer and defending an expected cross-complaint would be expensive. The Board decided it should attempt to settle the dispute without litigation. Some Association members strongly opposed this decision.

The developer submitted to the Board a proposed written "Settlement Agreement and Mutual Release" in which each party agreed to release the other from liability, with the developer agreeing to transfer to the Association a shuffleboard court and the Association agreeing to release the developer from performance under the terms of a maintenance bond and subsidy bond. The Association's attorney reviewed and approved the agreement, and

the Board voted unanimously to execute it. The agreement, effective in May 1988, was not disclosed to the DRE.

In April and May 1988, the DRE sent a deputy commissioner to investigate the developer. During the course of the investigation, the developer admitted it failed to provide accountings during the period of the subsidy agreement, and the Association had never formally approved or authorized the expenditure of Association funds for subsidy items, the expenditure of developer funds to meet Association expenses, or the provision of services in lieu of cash payments of assessments.

In July 1988 the DRE issued an order directing the developer to desist and refrain from selling, exchanging, leasing, or making any offerings in connection with the development of the subdivision until the developer (a) notifies the Real Estate Commissioner in writing of material changes in the subdivision offering, (b) corrects violations of cited provisions of the Business and Professions Code and DRE regulations, (c) pays in full $29,210.82 in assessments and any amount which became due after November 2, 1987, or makes arrangements satisfactory to the Real Estate Commissioner to assure payment within a reasonable time, and, (d) applies for and obtains an amended public report. The basis of the order was the developer's failure (1) to fulfill the representations made in the public report, (2) to inform the DRE of material changes in the offering which caused the public report to become misleading, (3) to perform under the terms of the subsidy agreement, and (4) to notify the DRE of material changes in the offering.

The developer claimed it had "overpaid" assessments by providing services or paying for services valued in excess of the amount of assessments due under the terms of the offering. Additionally, the developer contended the settlement agreement between the developer and the Association disposed of the issue.

Following an administrative hearing, an administrative law judge (ALJ) affirmed the issuance of the order, concluding that the only legal method for a developer to obtain credits or offsets for services performed or provided is by an in-kind subsidy agreement which has been approved by the DRE. In no event can the developer either obtain credit for any services which do not come within the specific categories of subsidy items or charge such items against reserves. The ALJ also concluded the settlement agreement by which the Association relinquished its right to unpaid assessments was a material change in the operation of the subdivision which required DRE notification. The DRE adopted the ALJ's decision.

The developer filed a petition for writ of mandamus in superior court claiming the DRE abused its discretion within the meaning of Code of Civil

Procedure section 1094.5 because the record does not support the findings and the findings do not support the decision. The trial court issued a peremptory writ of mandate commanding the DRE to set aside its decision.

## DISCUSSION

■ Although a trial court's findings of fact bind a reviewing court if substantial evidence supports those findings, the trial court's legal conclusions are not binding on appeal. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 915-916 [80 Cal.Rptr. 89, 458 P.2d 33].) Legal questions must be reviewed de novo. (*Los Angeles County Safety Police Assn.* v. *County of Los Angeles* (1987) 192 Cal.App.3d 1378, 1384 [237 Cal.Rptr. 920].)

■ The developer characterizes the issue to be whether substantial evidence supports the trial court's conclusion the developer owes nothing to the Association. The DRE sees the issue as a legal one—whether the trial court's conclusions are based upon a faulty construction of the law. According to the DRE, the developer cannot claim an offset or credit since the developer failed to comply with the mandatory reporting and review process of Business and Professions Code[2] section 11012. The DRE maintains the trial court's determination that the developer owes nothing to the Association assumes the law allows the developer to change materially the nature of the performance of its obligations as defined by the terms of the public report and the in-kind subsidy agreement in violation of state law, but to avoid any consequences of its unlawful activity by claiming a right to offset. We agree with the DRE that the propriety of the trial court's findings turns on the construction of applicable statutes and legal principles.

■ In an effort to protect the members of the public who purchase lots or homes from subdivision developers, the Legislature enacted the Subdivided Lands Act (Act). (*Bodily* v. *Parkmont Village Green Home Owners Assn., Inc.* (1980) 104 Cal.App.3d 348, 357 [163 Cal.Rptr. 658].) The objective of that Act is to prevent fraud and sharp practices in a type of real estate transaction peculiarly open to such abuses. (*People* v. *Byers* (1979) 90 Cal.App.3d 140, 148 [153 Cal.Rptr. 249].) To this end the Act establishes a comprehensive and elaborate statutory scheme to regulate such real estate transactions. (See § 11000 et seq.) The Act gives broad enforcement authority to the Real Estate Commissioner, including authority to adopt necessary rules and regulations (see Cal. Code Regs., tit. 10, § 2700 et seq.) and to issue orders, permits, decisions, demands or requirements to carry out the purposes of the Act. (§ 11001.)

---

[2]All statutory references are to the Business and Professions Code unless otherwise indicated .

Any person who intends to offer subdivided lands for sale or lease must first file an application for a public report with detailed information regarding the nature of the subdivided lands and the proposed offering. (§ 11010.) The commissioner issues a public report if the information is substantially complete. (§ 11010.2.) Once the commissioner has issued a public report, the subdivider must distribute a copy of the report to every prospective purchaser. (§§ 11027, 11018.1.)

Section 11012 provides it is ". . . unlawful for the owner, his agent, or subdivider, of the project, after it is submitted to the Department of Real Estate, to materially change the setup of such offering without first notifying the Department of Real Estate in writing of such intended change . . . ." The term "material change" as defined in department regulations includes the "[i]nability of the subdivider to fulfill agreements and assurances to purchasers of subdivision interests given by the subdivider to the commissioner in the application for a public report . . ." and "[d]elinquencies in the payment of regular assessments by owners within a common-interest subdivision resulting in the receipt by the Association of income which is more than 10% less than scheduled income from said assessments." (Cal. Code Regs., tit. 10, § 2800, subds. (e) and (k).)

The initial public report in this case referred to a budget for the operation of the Association and funding by lot assessments—$63.16 per lot each month for occupied lots and $45.32 per lot each month for unoccupied lots. Out of these assessments, $7.89 per lot each month was to be set aside for reserves. An amended public report included the subsidy agreement which reduced the monthly assessments per month and represented the subdivider would subsidize this reduction by performing certain specified operational items for the Association. In neither case was the DRE or the public informed that assessments would otherwise be reduced or eliminated or that assessments would otherwise be subsidized by the subdivider. Nor was the public informed that a reserve account would not be maintained despite an express representation to that effect and an express prohibition against the use of reserves for current operational expenses. The developer does not dispute it failed to comply with the notification requirements of section 11012, both with respect to its unilateral changes in the way in which the Association was operated during its administration of Association accounts and with respect to the subsequent settlement agreement with the Association.

The pivotal case upon which both parties and the trial court relied is *Bodily* v. *Parkmont Village Green Home Owners Assn., Inc., supra,* 104 Cal.App.3d 348. In that case the DRE had issued a public report which stated the developer would pay assessments on unsold lots. The developer

and the homeowners association subsequently entered into an oral agreement which eliminated the developer's obligation to pay assessments in exchange for which he agreed to maintain, at his own expense, the common areas of the development. The DRE was not notified of the agreement. Sometime thereafter, the developer filed a declaratory relief action against the DRE and homeowners association seeking a judicial determination that it did not owe the association $42,435.63 in unpaid assessments and an injunction against the DRE prohibiting the issuance of a cease and desist order. The homeowners association cross-complained seeking payment of the unpaid assessments. The trial court entered judgment in favor of the developer and found the developer was not liable to the homeowners association for unpaid assessments.

The homeowners association appealed, claiming the agreement was in violation of section 11012 because it constituted a material change. The developer argued section 11012 did not apply because the agreement did not materially change anything, but was merely the method the board of directors adopted to carry out its duty to provide for the maintenance of the common areas. The appellate court rejected the developer's argument. It relied upon *Barrett* v. *Hammer Builders, Inc.* (1961) 195 Cal.App.2d 305 [16 Cal.Rptr. 49].

In *Barrett*, the application of the developer to the DRE for a public report stated certain types of buildings would be constructed and the lots would be sold by grant deed. After the issuance of the public report, the developer constructed a different type of building and sold the lots by sales contracts. No one notified the DRE of the changes. A lot purchaser brought an action to rescind his purchase. The trial court ruled in favor of the lot purchaser because the developer had violated section 11012. The *Barrett* court held that any changes in the offering required the developer to notify the DRE. " '. . . It is clear that the legislative purpose of protecting the public would not be effectuated by permitting a subdivider to circumvent the legislative mandate.' " (*Bodily* v. *Parkmont Village Green Home Owners Assn., Inc.*, *supra*, 104 Cal.App.3d at p. 355, quoting from *Barrett* v. *Hammer Builders, Inc., supra*, 195 Cal.App.2d at p. 310.)

The *Bodily* court concluded any change that affected the assessment scheme by which funds were obtained to carry out the obligation of the homeowners association to maintain common areas "can only be termed a material change." (104 Cal.App.3d at p. 355.) The *Bodily* court also held substantial evidence in the record did not support the trial court's finding that the agreement was not detrimental to the homeowners association. The evidence reflected the agreement prevented the association from accumulating a substantial reserve for future expenses. (104 Cal.App.3d at p. 356.)

Similarly, the court rejected the developer's contention that the agreement did not affect purchasers of lots. "A purchaser of a unit would certainly be affected by the agreement if the result of the agreement was an Association that is not as financially stable as it would have been if there were no agreement." (*Ibid.*)

The *Bodily* court also rejected for several reasons the developer's claim that the homeowners association could not recover because of laches, one of those reasons being that the developer failed to prove prejudice. It is in this context that the *Bodily* court suggested the possibility of an offset:

"At the trial level, the court only determined liability. Since the trial court determined that Bodily was not liable to the Association because of the agreement, the issue of damages was not litigated. It would appear that whether the Association should recover the entire $21 a month a lot, or recover a lesser amount because Bodily did maintain the common areas, is an issue that should be litigated in the damage phase of the proceeding. If it is determined that the Association should not recover the entire $21, *it is possible that Bodily may not have been prejudiced by any delay in the Association's assertion of its rights.*" (104 Cal.App.3d at p. 358, italics added.)

In the present case, the developer characterizes his conduct as a "book-keeping shortcut" which "netted" together the Association's operating expenses and monthly assessment amounts. The developer cites the three "audits" and claims the evidence reflects the Association was in fact over-paid in assessments, and asserts the DRE audit reflects an entitlement to a credit for out-of-pocket expenses.

The trial court characterized the developer's failure to make assessment payments in accordance with the public report and the in-kind subsidy as an "in-kind collateral agreement" or "oral executed agreement," and concluded that although the DRE was not notified of this "agreement," it did not constitute a material change because it did not change the Association's financial position in any way since the Association would have had to pay for the services provided by the developer in any event. The trial court interpreted the DRE auditor's testimony to mean the claimed credits were reasonable. It also concluded the settlement agreement was not a material change because it did not affect the developer's obligation to pay future assessments, but was to "memorialize the conclusion of a past dispute."

1. *DRE Audit*

Nothing in the DRE audit indicates the auditor concluded the developer properly subsidized his obligation to pay assessments. The auditor merely

stated the developer claimed credit and indicated *if* the developer were given credit the accounting *could* reflect an overpayment of approximately $1,500. The auditor did not purport to have the power to authorize such an accounting procedure, nor did he purport to approve the developer's "bookkeeping shortcut." Although he believed the amount of money charged for the services provided by the developer appeared reasonable, he did not conclude the developer was in fact entitled to credit for those charges. He testified before the ALJ that he did not know at the time he calculated the claimed offsets whether the DRE would accept the offsets in lieu of assessment payments.

### 2. *Effect on Association's Financial Position*

■ We conclude the DRE need not demonstrate an impairment to the Association's finances in order to prove a material change in the subdivision's operational procedures. Such a requirement would read an exception into the statutory prohibition of section 11012 and the regulation which defines material change. Both the Legislature and the Real Estate Commissioner have determined any of the listed material changes have the potential for injuring the buying public. The object of section 11012 is to prevent injury by making a violation of its mandate illegal per se. We see nothing to indicate the Legislature intended that the DRE must prove injury in fact before it can establish a statutory violation.

Although *Bodily* v. *Parkmont Village Green Home Owners Assn., Inc.*, *supra*, 104 Cal.App.3d 348, discussed the financial implications of the material changes, its discussion must be viewed in context. First, the DRE was not a party to that appeal but appeared as amicus curiae in support of the association's effort to recover damages in the form of the unpaid assessments. The question before the court was whether the oral agreement between the developer and the homeowners association was unlawful, thereby rendering it void and the developer liable for unpaid assessments. The discussion of financial detriment was in response to the trial court's finding that the agreement was not detrimental to the homeowners association. The appellate court had already determined the agreement was a material change, since it affected the way in which assessments were levied. (104 Cal.App.3d at pp. 355-356.)

■ In this case the conclusion that the Association did not suffer a financial loss is not supported by the record. Although the developer at one time made conflicting statements regarding the existence of a reserve account, there is no evidence that a reserve account was fully funded from assessments during the developer's administration of the Association

accounts.[3] As the court concluded in *Bodily*, the Association's financial position was changed because it was prevented from accumulating reserves for future expenses. (104 Cal.App.3d at p. 356.) However, we do not believe such a conclusion was necessary for a determination that a material change had occurred.

### 3. *Settlement Agreement*

■   The evidence is undisputed that the DRE was not notified of the settlement agreement between the Association and the developer executed prior to the issuance of the DRE cease-and-desist order. The trial court concluded the agreement did not constitute a material change in violation of section 11012 because it was intended "to memorialize the conclusion of a past dispute." In this way the developer and the trial court distinguish this agreement from the agreement in *Bodily*: whereas the agreement in *Bodily* released the developer from an obligation to pay future assessments, the agreement here released the developer from its liability for past assessments.

The issue is whether the Association has the authority to excuse the developer for past violations of the law. The answer is "no." "[A] law established for a public reason cannot be contravened by a private agreement." (Civ. Code, § 3513.) The agreement does not bind the DRE, for if it did a developer could circumvent the legislative mandate of section 11012 by inducing the party which the law seeks to protect into approving the unlawful conduct after the harm has been done.

The possibilities for abuse are apparent from this very case. The Association entered into this agreement because of the potential costs of litigation to recover unpaid assessments and because of the fear the developer would seek to recover funds he claimed to have spent for the Association in excess of the amount of assessments for which he was liable. Regardless of the merits of such a lawsuit, the costs were not worth the gamble to the Association.

### 4. *Developer's Entitlement to Credit or Offset*

The ALJ concluded the only way to obtain a credit or offset against the obligation to pay assessments is by way of an approved subsidy agreement. In other words, since a material change must be effected by compliance with

---

[3]Developer claims the DRE raises this issue for the first time on appeal. We disagree. As a result of the developer's malfeasance, the reserve account was never funded from assessments. The DRE has argued throughout these proceedings that the developer's actions were not merely a harmless bookkeeping shortcut but created a serious shortfall in the reserve fund.

the notification and reporting requirements of the Act, and since the developer failed to comply with those requirements, he has no right to offset. Moreover, the ALJ concluded expenses incurred for items not identified in the existing in-kind subsidy agreement approved by the DRE could not be "charged off" against the unpaid assessments. Nor could such expenses be charged against that portion which was to be set aside for reserves.

On appeal the DRE claims the developer has no right to offset because it violated the law. Even assuming the concept of offset is valid, according to the DRE, the developer is limited to the remedy of offset in a civil action for damages by the Association against the developer to recover unpaid assessments. Furthermore, any entitlement to offset is limited by the terms of the approved in-kind subsidy agreement.

The developer claims denial of its right to offset in these circumstances would be to legislate an amendment to the statutory scheme governing subdivision developers which would have the effect of a forfeiture provision. He claims *Bodily* "expressly recognized the developer's right to receive offsets for the reasonable value of services rendered under an agreement which was found to violate Business and Professions Code section 11012."

The developer's construction of the *Bodily* court's discussion of offset is overly broad. The discussion is obiter dictum; it did not establish the developer's entitlement to an offset. It merely indicated it was possible the Association might not recover the entire assessment per lot if the developer could establish he had maintained the common areas. (104 Cal.App.3d 348.) *Bodily* does not establish the developer's entitlement to reduced assessment liability by the expenditure of funds on any item which the developer claims to have been for the benefit of the Association.

We have been unable to find statutory authority either expressly recognizing or expressly forbidding a developer's right to credit or offset against unpaid assessments in these circumstances. ██ ██ We are persuaded by equitable principles to recognize a limited offset or credit as an affirmative defense which can be raised in the context of the administrative proceedings. (Gov. Code, § 11506, subd. (a)(5).) The scope of this affirmative defense, however, is not as expansive as the developer suggests.

First, to the extent the developer failed to fund the reserve account provided by the public report, no offset or credit can be allowed. As we have previously noted, the reserve account protects present and future subdivision owners, and the requirements for such accounts cannot be altered by the actions of the developer without DRE approval.

For any other claimed offset the developer's entitlement must be limited by the terms of the budget as reflected in the application upon which the public report is issued or as reflected in an approved subsidy agreement. Since the Association's authority to make expenditures is controlled by its budget, so too is the developer's authority to make expenditures on behalf of the Association. To the extent the developer alters or exceeds the budget or the terms of a subsidy agreement, the developer must comply with the mandatory notification and reporting requirements. If the developer fails to notify the DRE of changes in the budget or modifications in the subsidy agreement, the developer's unilateral expenditure is without legal authority and is done at the developer's risk. In essence, it is a gift from the developer.

The developer claimed the original budget submitted to the DRE and referred to in the public report was incomplete because it did not provide for certain necessary expenses. Rather than comply with the reporting and notification requirements and obtaining an amendment to the public report to modify the budget, the developer unilaterally altered the budget as it saw fit, thereby circumventing the regulatory objectives of the Act. The law does not provide for the unilateral modification or alteration of a budget by a developer without compliance with the notification requirements of section 11012. (See Cal. Code Regs., tit. 10, § 2800.)

An obvious purpose for requiring a subdivider to submit a budget for the operation and maintenance of the development is to provide some method for regulation of the use of owners association funds to prevent abuses by subdividers. The record before us does not disclose whether the trial court reviewed the "audits" to determine if the claimed credits were for budgeted items or if the subdivider exceeded the budget without legal authorization. Likewise it does not appear the trial court considered whether the developer was charging current operating expenses against reserves for future maintenance.

We reverse the judgment with directions to the trial court to remand the case to the ALJ for the purpose of ascertaining the developer's entitlement to reduce its liability for unpaid assessments to the extent that it provided, at its own expense, for operational items which are identified in the approved budget. To the extent it provided services or benefits which exceeded the monetary allotments contained in the budget, it is not entitled to offset nor does it have a right to recoup those expenditures from the Association. Under no circumstances can the developer reduce its liability for unpaid assessments to the extent those assessments were to fund the reserve account.

## DISPOSITION[4]

We reverse the judgment and order each party to bear its own costs on appeal.

Ardaiz, J., and Buckley, J., concurred.

---

[4]The developer requested that we take judicial notice of the judgment and notice of entry of judgment in superior court case No. 393549-1. Those documents are irrelevant to our disposition of this appeal. We deny the request to take judicial notice.